UNIVERSITY OF GEORGIA
ATHLETIC ASSOCIATION,
etc., Plaintiff-Appellee,

v.

Bill LAITE, individually and d/b/a Bill
Laite Distributing Co.,
Defendant-Appellant.

No. 84–8179.

United States Court of Appeals,
Eleventh Circuit.

April 8, 1985.

William H. Major, Atlanta, Ga., Lamar W. Sizemore, Jr., Macon, Ga., for defendant-appellant.

Nickolas P. Chilivis, Kenneth G. Menedez, Atlanta, Ga., for plaintiff-appellee.

Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS *, District Judge.

KRAVITCH, Circuit Judge:

In the fall of 1982, when the fancy of Georgia sports fans turned to thoughts of college football, Bill Laite Distributing Co.

---

* Honorable C. Clyde Atkins, U.S. District Judge, Southern District of Florida, sitting by designation.

("Laite"), a Macon, Georgia wholesaler of novelty beers, began marketing "Battlin' Bulldog Beer." The beer was sold in red-and-black cans bearing the portrayal of an English bulldog wearing a red sweater emblazoned with a black "G." The bulldog had bloodshot eyes, a football tucked under its right "arm," and a frothy beer stein in its left "hand."

Laite hoped that the "Battlin' Bulldog" would pile up yardage and score big points in the always-competitive alcoholic beverage market. Unfortunately, however, the pug-faced pooch was thrown for a loss by the University of Georgia Athletic Association, Inc. ("UGAA"), which obtained preliminary and permanent injunctive relief in federal district court based on the "likelihood of confusion" between the "Battlin' Bulldog" and the "University of Georgia Bulldog." Laite now cries "foul," arguing that (1) the "University of Georgia Bulldog" is not a valid trade or service mark worthy of protection, (2) the district court used the wrong factors in comparing the "Battlin' Bulldog" with the "University of Georgia Bulldog," and (3) the court's conclusion that the sale of "Battlin' Bulldog Beer" created a "likelihood of confusion" is clearly erroneous. After viewing a "replay" of the proceedings below, we conclude that no error was committed and affirm the judgment of the district court in all respects.

## I. BACKGROUND

The University of Georgia's athletic teams have long used the nickname, "Bulldogs."[1] In 1981, UGAA registered with the State of Georgia certain service marks incorporating the word "bulldog" or the portrayal of an English bulldog. One such service mark depicts an English bulldog wearing a sweater with a "G" emblazoned on it. *See* Office of Secretary of State, State of Georgia, Service Mark, File Reference No. S–4673 (application filed September 21, 1981; registration dated November 25, 1981). Another service mark depicts the word "BULLDOGS" in projecting block letters. *See id.* at No. S–4667 (application filed September 21, 1981; registration dated November 25, 1981). These marks were registered for use in connection with "services related to sports activities." UGAA also applied for federal registration of the marks.[2] Similar unregistered trade and service marks have been used by UGAA in connection with the University of Georgia's athletic teams. The university's colors are red and black.

In October, 1982, Laite began distributing the red-and-black cans of "Battlin' Bulldog Beer" to stores in the Atlanta area and throughout Georgia. One side of the cans contained the portrayal of an English bulldog described earlier. The opposite side of the cans contained the words, "BATTLIN' BULLDOG BEER" (in prominent red block letters), and, "Not associated with the University of Georgia" (in small silver print). Laite previously had sought permission from UGAA to use an exact reproduction of the "University of Georgia Bulldog" on the cans, but such permission had been denied.

Upon learning of the appearance of "Battlin' Bulldog Beer" on the market,[3] UGAA informed Laite that it believed the cans infringed its registered and unregistered marks, and demanded that Laite cease distributing the beer. When Laite refused, UGAA filed suit against Laite in the United States District Court for the

---

1. Although the record does not reveal the origins of the nickname itself, registration documents filed with the Office of the Secretary of State, State of Georgia, indicate that the University of Georgia first used a portrayal of an English bulldog wearing a sweater emblazoned with a "G," as a service mark, in the fall of 1963.

2. The applications for federal registration of the marks apparently were pending at the time of the injunction hearings in the court below.

3. UGAA learned about the appearance of "Battlin' Bulldog Beer" through a newspaper article in the October 11, 1982 edition of the Atlanta Constitution. The article was entitled, " 'Dog beer a natural for Georgia," and contained pictures of the front and back of a can of "Battlin' Bulldog Beer."

Middle District of Georgia. UGAA sought actual and punitive damages, an accounting of Laite's profits from the sale of the beer, a declaration that Laite's use of UGAA's marks was unlawful, an injunction against further misuse of UGAA's marks, and costs and attorney's fees. The suit was based on five legal theories: (1) false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);[4] (2) trademark infringement in violation of Ga.Code Ann. § 10–1–450;[5] (3) deceptive trade practice in violation of the Uniform Deceptive Trade Practices Act, Ga.Code Ann. §§ 10–1–370 to –375;[6] (4) dilution of UGAA's marks in violation of the Georgia Anti-Dilution Statute, Ga.Code Ann. § 10–1–451(b);[7] and (5) unfair competition in violation of Ga.Code Ann. § 23–2–55.[8]

UGAA moved for a preliminary injunction to prevent Laite from producing, distributing, or selling "Battlin' Bulldog Beer." After a hearing, the district court granted UGAA's motion, concluding that UGAA was likely to prevail on its Lanham Act claim and that the remaining conditions for preliminary injunctive relief were met.[9]

4. 15 U.S.C. § 1125(a) provides:
 (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers of goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

5. Ga.Code Ann. § 10–1–450 provides, in pertinent part:
 [A]ny person who shall:
 (1) Use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a trademark or service mark registered under this part in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services; or
 (2) Reproduce, counterfeit, copy, or colorably imitate any such trademark or service mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in connection with the sale or other distribution in this state of such goods or services;
 shall be liable to a civil action by the owner of such registered trademark or service mark....

6. Ga.Code Ann. § 10–1–372 provides, in pertinent part:
 (a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
 (1) Passes off goods or services as those of another;
 (2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
 (3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; ...
 (b) In order to prevail in an action under this part, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

7. Ga.Code Ann. § 10–1–451(b) provides, in pertinent part:
 (b) Every ... association ... adopting and using a trademark, trade name, label, or form of advertisement may proceed by action; and all courts having jurisdiction thereof shall grant injunctions to enjoin subsequent use by another of the same or any similar trademark, trade name, label, or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the trademark, trade name, label, or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services....

8. Ga.Code Ann. § 23–2–55 provides:
 Any attempt to encroach upon the business of a trader or other person by the use of similar trademarks, names, or devices, with the intention of deceiving and misleading the public, is a fraud for which equity will grant relief.

9. Laite filed a notice of appeal and an emergency motion asking this court to stay the order granting the preliminary injunction. This court

Meanwhile, Laite filed an answer to UGAA's complaint and requested a jury trial. At a pre-trial conference, counsel for both parties agreed to limit the evidence at trial to the transcript of the preliminary injunction hearing, the exhibits presented at that hearing, and supplementary documents to be submitted by the parties.[10] UGAA subsequently informed the district court that, if the court determined that Laite was entitled to a jury trial because of the presence of both legal and equitable claims in the complaint, UGAA would voluntarily dismiss the legal claims. The district court entered an order (1) ruling that Laite was entitled to a jury trial, (2) voluntarily dismissing UGAA's legal claims, (3) permanently enjoining Laite from marketing or distributing "Battlin' Bulldog Beer" under the challenged label design, and (4) awarding costs to UGAA, but denying UGAA's request for attorney's fees. The district court entered final judgment on the order.

Laite then moved to alter or amend the district court's order and judgment, or in the alternative for a new trial, on the grounds that the parties had reserved the right to submit additional evidence in support of their respective positions. The district court took additional evidence from both parties, and, after reviewing the additional evidence, entered an order (1) granting Laite's motion to alter or amend the order and judgment for the purpose of including the additional evidence in the record, but (2) otherwise denying Laite's motion. This appeal ensued.

## II. DISCUSSION

We kick off our discussion by noting that the district court, in granting preliminary injunctive relief to UGAA, discussed only the Lanham Act claim and did not mention the claims arising under Georgia law. In the final order granting UGAA's request for a permanent injunction, the district court stated:

> With respect to the claim for permanent injunctive relief, the court is convinced that its preliminary injunctive order dated October 22, 1982, was in all respects correct under the facts established at the preliminary injunction hearing, i.e., that the label design at issue tends falsely to describe or represent the origin of the product at issue to the detriment of plaintiff. The findings of fact in that order are adopted here. It is therefore this court's conclusion of law, and it is hereby ORDERED and ADJUDGED, that the defendant be PERMANENTLY ENJOINED from marketing or distributing Battlin' Bulldog Beer under the label design adopted by defendant which was the subject of this action.

Again, the district court did not mention the state law claims. On appeal, therefore, we are limited to determining whether the district court's decision was proper under section 43(a) of the Lanham Act.[11]

---

denied Laite's emergency motion. On January 19, 1983, Laite voluntarily dismissed the interlocutory appeal.

**10.** Counsel for both parties also agreed to waive the best evidence rule, unless one party or the other objected to the introduction of a particular document.

**11.** We observe in passing, however, that the standards governing most of the claims under Georgia law are similar, if not identical, to those under the Lanham Act. *See, e.g., Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258–59 (5th Cir.) (test for deceptive trade practice and unfair competition under Georgia law same as test for false designation of origin under Lanham Act, namely, "whether defendants' use of the mark ... is likely to cause confusion, mis-

take, or deception"), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Rolls-Royce Motors, Ltd. v. A & A Fiberglass, Inc.,* 428 F.Supp. 689, 693–94 (N.D.Ga.1976) (Georgia trademark statute "is, both in structure and purpose, similar to its federal counterpart," and federal standards may be used to construe state statute); *cf. Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 839 & n. 14 (11th Cir.1983) (district court held test for deceptive trade practice and unfair competition under Georgia law same as test for false designation of origin under Lanham Act). Thus, whatever conclusion we reach on the Lanham Act claim likely would apply to most of the state law claims as well.

**A. Whether the "University of Georgia Bulldog" is a Valid Trade or Service Mark Worthy of Protection**

Laite's first argument on appeal is that the "University of Georgia Bulldog" is not a valid trade or service mark worthy of protection.[12] Laite cites *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911 (S.D.N.Y.1983), *aff'd on other grounds,* 746 F.2d 112 (2d Cir.1984), for the proposition that "[t]o make a successful claim of false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), [plaintiff] must demonstrate that its trademark possesses 'secondary meaning'—'[t]he power of a name or other configuration to symbolize a particular business, product or company....' " *Id.* at 923 (citations omitted). Laite contends that the record does not contain sufficient proof of secondary meaning, and that the vagueness of UGAA's mark, coupled with extensive third-party uses of the same or similar marks, demonstrates the absence of secondary meaning.

 The threshold question, however, is whether *Universal City Studios* accurately states the law of this circuit concerning the need for proof of secondary meaning under section 43(a) of the Lanham Act. We conclude that it does not. The general rule in this circuit is that proof of secondary meaning is required *only* when protection is sought for descriptive marks, as opposed to arbitrary or suggestive marks. We have long recognized that:

> Service marks fall into four categories. A strong mark is usually fictitious, arbitrary or fanciful and is generally inherently distinctive. It is afforded the widest ambit of protection.... A descriptive mark tells something about the product; it is protected only when secondary meaning is shown.... In contrast to the

above is the suggestive mark, which subtly connotes something about the service or product. Although less distinctive than a fictitious, arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning. *See Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184 (5th Cir.1980) ("If used as a trademark for refrigerators, the term 'Penguin' would be suggestive.") [*cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981)]. Lastly, there are generic terms, which communicate 'information about the nature or class of an article or service,' *America[n] Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 11 (5th Cir. 1974), and therefore can never become a service or trademark.

*Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Ass'n,* 651 F.2d 311, 315 (5th Cir.1981) [13] (citations and footnotes omitted); *accord, Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1165 n. 9 (11th Cir.1982); *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 115–16 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). Thus, secondary meaning is best characterized not as a general prerequisite for trade or service mark protection, but as a means by which otherwise unprotectible descriptive marks may obtain protection. *See Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 848 (5th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970). As one commentator has explained:

> Secondary meaning converts a word originally incapable of serving as a mark into a full fledged trademark.... An arbitrary, fanciful, or otherwise distinctive word qualifies as a trademark immediate-

---

**12.** We use the term, "University of Georgia Bulldog," to describe collectively the various portrayals of an English bulldog used by UGAA as a trade or service mark in connection with the University of Georgia's athletic teams. UGAA's claim in the instant case primarily relates to these pictorial images of a bulldog, and not to Laite's mere use of the word, "Bulldog."

**13.** The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

ly, because in the particular industry it has no primary meaning to overcome. Therefore it is initially registrable, and also protectible at common law. In the case of words with primary meaning, the reverse is true. Such words, be they descriptive or geographical, are initially nonregistrable and unprotectible unless and until they have attained secondary meaning as trademarks.

3 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies §§ 19.25, 19.26 at pp. 19–79, 19–85 (4th ed. 1983).

Although most of our cases applying this general rule have involved claims under 15 U.S.C. § 1114(a) for infringement of federally registered marks, the same rule necessarily applies to section 43(a) claims based on non-federally-registered marks. After all, "registration of a trademark confers only procedural advantages and does not enlarge the registrant's rights, for ownership of the trademark rests on adoption and use, not on registration." *Turner v. HMH Publishing Co.,* 380 F.2d 224, 228 (5th Cir.) (citation omitted), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967). We also note that the Fifth Circuit, in an action under section 43(a) based on infringement of a trade dress, has held:

[S]econdary meaning [need not] be shown in every trade dress infringement suit [under section 43(a) ].... If the fea-

tures of the trade dress sought to be protected are arbitrary and serve no function either to describe the product or assist in its effective packaging, there is no reason to require a plaintiff to show consumer connotations associated with such arbitrarily selected features.

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 702 (5th Cir. Unit A 1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).[14]

We therefore hold that, contrary to the language of *Universal City Studios,* proof of secondary meaning is required in an action under section 43(a) *only* when protection is sought for a descriptive mark, as opposed to an arbitrary or suggestive mark.[15] Turning to the mark at issue in the instant case, we are convinced beyond a shadow of a doubt that the "University of Georgia Bulldog" is not a descriptive mark. In our view, the portrayal of an English bulldog chosen by the university as a symbol for its athletic teams is, at best, "suggestive," if not downright "arbitrary."[16] Thus, contrary to Laite's assertion, UGAA was not required to prove secondary meaning in order to prevail on its Lanham Act claim, and the district court did not err in granting injunctive relief to UGAA under

**14.** Although *Chevron Chemical Co.* is not binding precedent in this circuit, *see infra* note 18, we have cited it with approval in at least four recent cases. *See Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 & n. 5 (11th Cir.1984); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,* 716 F.2d 854, 857 & n. 9 (11th Cir.1983); *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 981 n. 25 (11th Cir.1983); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 831 & n. 14 (11th Cir.1982).

The persuasive value of *Chevron Chemical Co.* is not diminished because the case involved a trade dress rather than a trade or service mark. In fact, the *Chevron Chemical Co.* court based its holding on the law of trademarks:

The term "secondary meaning" was developed as part of the common-law of trademarks.... [T]rademark law requires a demonstration of "secondary meaning" only when the claimed trademark is not sufficiently distinctive of itself to identify the purchaser.

The same principles should apply to protection of trade dresses.
659 F.2d at 702.

**15.** Of course, a plaintiff whose mark is unregistered and devoid of secondary meaning may find it difficult to establish priority in use of the mark. *See generally* 3 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 19.15 at p. 19–37 (4th ed. 1983). In the instant case, however, it is undisputed that UGAA used the mark at issue long before Laite's allegedly improper use began.

**16.** We see very little connection between the attributes of an English bulldog and, for example, the University of Georgia tennis team. Furthermore, although the University of Georgia football team arguably may possess some of the attributes of a bulldog, one could hardly call the portrayal of a bulldog at issue in this case "descriptive" of the average University of Georgia football player.

section 43(a) despite the absence of proof of secondary meaning.[17]

### B. Whether the District Court Used the Wrong Factors in Comparing the "Battlin' Bulldog" with the "University of Georgia Bulldog"

■ Laite's next argument is that the district court used the wrong factors in comparing the "Battlin' Bulldog" with the "University of Georgia Bulldog." Laite correctly points out that this circuit has recognized seven factors as relevant to the determination of a "likelihood of confusion" between two trade or service marks: (1) the type of mark at issue, (2) the similarity of design between the two marks, (3) the similarity of product, (4) the identity of retail outlets and purchasers, (5) the identity of advertising media utilized, (6) the defendant's intent, and (7) actual confusion between the two marks. *See Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir. 1975); *accord, Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514 (11th Cir.1984); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 840 (11th Cir.1983); *Safeway Stores, Inc.*, 675 F.2d at 1164; *Sun-Fun Products, Inc. v. Suntan Research & Development Inc.*, 656 F.2d 186, 189 (5th Cir. Unit B 1981);[18] *Sun Banks of Florida, Inc.*, 651 F.2d at 314; *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). According to Laite, the court below erred by failing to consider all seven of the relevant factors before deciding that the sale of "Battlin' Bulldog Beer" created a "likelihood of confusion."

The difficulty with this argument is two-fold. First, we are not convinced, after examining the record and the orders entered by the district court, that the court failed to consider all seven of the relevant factors. At the preliminary injunction hearing, counsel for Laite discussed at length the seven factors, as set out in the *Amstar Corp.* case.[19] Moreover, in the order granting the preliminary injunction, the district court cited *Amstar Corp.* and specifically mentioned two of the seven factors, namely, the similarity of design and the defendant's intent. The fact that the court did not discuss the other five factors may indicate only that the court found those factors insignificant under the circumstances. We never have held that a court must specifically mention each of the seven factors in order to avoid reversal on appeal. *Cf. Conagra, Inc.*, 743 F.2d at 1514 & n. 8 (appellate court found two of the seven factors sufficient to compel finding of likely confusion, and chose not to address the other five factors).

The second problem with Laite's argument is that it is inextricably intertwined with the question whether the district court's factual finding of "likelihood of confusion" was correct. In *Sun Banks of Florida, Inc.*, the appellant, like Laite, attempted to avoid the "clearly erroneous" standard of review for factual findings by arguing that the district court failed to consider the proper factors in determining "likelihood of confusion." We rejected this distinction, explaining:

> Our comment in *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 384 (5th Cir.1977), that "when a district court labors under a misappre-

---

**17.** An alternative interpretation of Laite's argument is that UGAA has "abandoned" its mark by failing diligently to protect it against third-party uses. We reject this argument on the grounds that the record reveals neither an actual abandonment of the mark by UGAA nor an intent on the part of UGAA to abandon the mark. *See Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir.1984) ("In order to prove abandonment, defendants must show that plaintiff actually abandoned the use of the mark, and, also, that plaintiff intended to abandon the mark."). On the contrary, the record shows that

UGAA has engaged in licensing of the "University of Georgia Bulldog," indicating that UGAA views its mark as highly valuable and intends to continue capitalizing on that value.

**18.** Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

**19.** *See* Transcript of Preliminary Injunction Hearing at pp. 37–45.

hension concerning the governing legal norms, the 'clearly erroneous' standard no longer cirmcumscribes [sic] appellate review," may not be taken as an erosion of the standard of review applicable to a finding of likelihood of confusion. 651 F.2d at 314.

Similarly, in *Safeway Stores, Inc.*, we refused to treat as a separate ground for reversal the appellant's claim that the district court had failed to consider all seven of the relevant factors. Instead, we indicated that "[o]ur review of the district court's ruling ... is governed by the clearly erroneous test *even though* the court's analysis of the factors relevant to a finding of likelihood of confusion was incomplete." 675 F.2d at 1164 n. 3 (emphasis added).

In short, even were we to agree with Laite that the court below failed to consider some of the relevant factors, this would not constitute an independent basis for reversing the court's decision. The real question is whether the court's ultimate determination about the "likelihood of confusion" was correct.[20] We therefore proceed to the third and final issue on appeal.

C. Whether the District Court's Conclusion that the Sale of "Battlin' Bulldog Beer" Created a "Likelihood of Confusion" is Clearly Erroneous

■ Laite's final argument is that the district court's conclusion that the sale of "Battlin' Bulldog Beer" created a "likelihood of confusion" is clearly erroneous. *See Jellibeans, Inc.*, 716 F.2d at 839–40 & n. 16 ("likelihood of confusion" factual finding subject to "clearly erroneous" standard of review); *Safeway Stores, Inc.*, 675

F.2d at 1163 (same); *Amstar Corp.*, 615 F.2d at 257–58 (same). *But see Elby's Big Boys of Steubenville, Inc. v. Frisch's Restaurants, Inc.*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982) (White, J., dissenting from denial of certiorari) (discussing split in circuits on whether "likelihood of confusion" is question of fact or legal conclusion). A district court's factual finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). While the "clearly erroneous" standard of review is less stringent than the well-known sports rule, "The referee is always right," it nevertheless presents a formidable challenge to appellants who, like Laite, seek to overturn the factual findings of a district court.

■ After reviewing the record, we cannot say that we are "left with the definite and firm conviction that a mistake has been committed." *Id.* On the contrary, we agree with the district court that the sale of "Battlin' Bulldog Beer" created a "likelihood of confusion." We find most significant the same two factors that were identified by the district court, the similarity of design between the two marks and the defendant's intent. In our view, these two factors alone are sufficient to support the conclusion reached by the court below.

The most cursory visual examination of the two bulldogs in this case reveals their similarity:

**20.** Laite's argument really amounts to nothing more than a legal version of the old "hidden ball" trick.

 

A can of "Battlin' Bulldog Beer"

 

The "University of Georgia Bulldog"

As the district court pointed out, it is the combination of similar design elements, rather than any individual element, that compels the conclusion that the two bulldogs are similar. Had the cans of "Battlin' Bulldog Beer" been printed in different colors, or had the "Battlin' Bulldog" worn a different monogram on its sweater, we might have a different case. Instead, the cans are red and black, the colors of the University of Georgia, and the "Battlin' Bulldog" wears the letter "G." To be sure, the "Battlin' Bulldog" is not an exact reproduction of the "University of Georgia

Bulldog." Nevertheless, we find the differences between the two so minor as to be legally, if not factually, nonexistent.[21]

The defendant's intent likewise is apparent from the record. The record establishes that the Royal Brewing Company of New Orleans, Louisiana, the brewer of "Battlin' Bulldog Beer," wrote to several southeastern colleges, including the University of Georgia, seeking permission to use the colleges' symbols on cans of beer.[22] Furthermore, Laite candidly admitted in the court below, and at oral argument in this court, that "Battlin' Bulldog Beer" was intended to capitalize on the popularity of the University of Georgia football program.[23] In short, there can be no doubt that Laite hoped to sell "Battlin' Bulldog Beer" not because the beer tastes great,[24] but because the cans would catch the attention of University of Georgia football fans.

■ Although we find the defendant's intent and the similarity of design between the two marks sufficient to support the district court's finding of a "likelihood of confusion," we also note that the remaining five factors either support the same conclusion or, at least, do not undermine it. For example, as we previously noted, the type of mark at issue in this case is at best "suggestive," if not downright "arbitrary." Such marks traditionally have been charac-

terized as "strong." *See Safeway Stores, Inc.*, 675 F.2d at 1164–65 ("Safeway" mark held "a relatively strong one with at least the qualities of a suggestive mark"). The fact that many other colleges, junior colleges, and high schools use an English bulldog as a symbol[25] does not significantly diminish the strength of UGAA's mark, since almost all of the other schools (1) are geographically remote, (2) use a different color scheme, or (3) have names that begin with a letter other than "G." The remaining schools are so few in number and small in size that they pose no real threat to the strength of UGAA's mark.[26] *Cf. id.* at 1165 (third-party use of word "Safeway" does not diminish strength of mark, since most third-party users also employ distinctive additional words or engage in different businesses from plaintiff's).

■ Nor do we find it significant that the record in this case includes numerous examples of products containing either exact or approximate reproductions of the "University of Georgia Bulldog." The record does not reveal how many of these products were licensed by UGAA; the widespread use of a mark by licensees would tend to support, rather than rebut, the proposition that UGAA's mark is a strong one.[27] On balance, we conclude that

**21.** Laite contends that the "Battlin' Bulldog" has a much longer tail than the "University of Georgia Bulldog," and wears a different kind of sweater. We find these distinctions trivial, especially in light of the similarities discussed in the text.

**22.** Royal Brewing Company apparently contacted Georgia Tech University ("Ramblin' Wreck Beer"), the University of Kentucky ("Fighting Wildcats Beer"), and Louisiana State University ("Fighting Tigers Beer").

Although the record does not reveal whether Royal Brewing Company contacted any other schools, one shudders to think of such possible concoctions as "Deacon Beer" (Wake Forest University) or "Quaker Beer" (the University of Pennsylvania).

**23.** This, of course, is why the "Battlin' Bulldog" carries a football under one "arm."

**24.** Nor is there any evidence in the record that "Battlin' Bulldog Beer" is, to borrow the words of a well-known commercial, "less filling."

**25.** In the court below, Laite introduced a list of twenty-six high schools, fourteen junior colleges, and sixteen colleges that use an English bulldog as a mascot. The list includes the Citadel, Drake University, Fresno State University, Mississippi State University, Louisiana Tech University, and Yale University.

**26.** The only schools identified by Laite that use an English bulldog as a mascot, are located in Georgia, use red and black as the school colors, and have names that begin with the letter "G," are Georgia Military College (a junior college in Milledgeville, Georgia, with an enrollment of 365) and North Gwinnett High School.

**27.** In addition, we note that even unauthorized third-party uses of a mark do not necessarily render the mark "weak." The proper inquiry is whether the unauthorized third-party uses significantly diminish the public's perception that the mark identifies items connected with the owner of the mark. *Cf. Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082–85 (5th Cir.1982) (no "likeli-

the "University of Georgia Bulldog" is a relatively strong mark, at least in Georgia.

We also find in the record persuasive evidence of actual confusion between the two marks. UGAA introduced an affidavit from a University of Georgia professor who stated:

> During the week of October 11, 1982, I received approximately ten (10) to fifteen (15) inquiries in person or by telephone about the sale and distribution of Battlin' Bulldog Beer and its connection with the University of Georgia. Most of those who made the inquiries were concerned that Battlin' Bulldog Beer was not the sort of product that should be licensed by or in any way related to the University of Georgia, and inquiries were made as to whether or not the University had granted permission to use its symbols on the product.

According to the affidavit, one caller expressly stated that he thought it was clear that the "Battlin' Bulldog Beer" can included a "University of Georgia Bulldog."

■ Laite argues that any "confusion" over the beer relates not to its origin, but to whether it has been licensed by the University of Georgia. According to Laite, no one actually believes that the University of Georgia has gone into the brewing business. Regardless of the validity of this statement, we find it irrelevant to the issues in this case. In *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), this court's predecessor held that "confusion" need not relate to the origin of the challenged *product*. Rather, "confusion" may relate to the public's knowledge that the *trademark*, which is "the triggering mechanism" for the sale of the product, originates with the plaintiff. *See id.* at 1012.[28] The *Boston Pro. Hockey*

---

hood of confusion" when, because of unauthorized third-party uses of mark, public had no reasonable basis to assume that mark could only be used with approval or sponsorship of owner of mark).

**28.** See also *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979), in which the Second Circuit stated:

> Defendants assert that the Lanham Act requires confusion as to the origin of the film, and they contend that no reasonable person would believe that the film originated with plaintiff. Appellants read the confusion requirement too narrowly. In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market.... The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.

*Id.* at 204–05 (citations omitted); *accord, National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 659 (W.D.Wash.1982) ("Trademark law does not just protect the producers of products. The creation of confusion as to sponsorship of products is also actionable."); *cf. University of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040, 1047–48 (3d Cir.) (discussing development of "confusion of sponsorship" doctrine), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982).

In *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir.1980), the Ninth Circuit sharply criticized the *Boston Pro. Hockey* decision for "extend[ing] the protection [of trademark law] beyond that intended by

Congress and beyond that accorded by any other court." *Id.* at 919. The Ninth Circuit explained the basis for its criticism as follows:

> We commonly identify ourselves by displaying emblems expressing allegiances. Our jewelry, clothing, and cars are emblazoned with inscriptions showing the organizations we belong to, the schools we attend, the landmarks we have visited, the sports teams we support, the beverages we imbibe. Although these inscriptions frequently include names and emblems that are also used as collective marks or trademarks, it would be naive to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization the name or emblem signifies.

*Id.* at 918.

We respectfully disagree. The record in the instant case reveals that, in one week, at least ten to fifteen members of the public contacted UGAA to inquire about the connection between "Battlin' Bulldog Beer" and the University of Georgia. *See infra* text at p. 1547. This evidence indicates that, contrary to the unsupported assertion of the Ninth Circuit in *Job's Daughters*, at least some members of the public *do* assume that products bearing the mark of a school or a sports team are sponsored or licensed by the school or team. *See also National Football League Properties, Inc.*, 532 F.Supp. at 659 (survey revealed that roughly half of all persons shown football jerseys containing names of National Football League teams and players "believed that the manufacturer was required to obtain authorization from the NFL or

rule applies to claims under section 43(a) of the Lanham Act, as well as to claims for infringement of federally registered trademarks. *See id.* at 1012–13.

Laite also argues that no confusion could result from the sale of "Battlin' Bulldog Beer" because the cans contain the disclaimer, "Not associated with the University of Georgia." We reject this argument for two reasons. First, the disclaimer is relatively inconspicuous on the individual cans, and practically invisible when the cans are grouped together into six-packs. Second, in the *Boston Pro. Hockey* case we dismissed a similar argument, stating:

> The exact duplication of the symbol and the sale as the team's emblem satisfying the confusion requirement of the law, words which indicate it was not authorized by the trademark owner are insufficient to remedy the illegal confusion. Only a prohibition of the unauthorized use will sufficiently remedy the wrong.

510 F.2d at 1013.

Finally, we find the remaining three factors, similarity of product, identity of retail outlets and purchasers, and identity of advertising media utilized, less significant in the instant case than in most trade or service mark cases. These factors primarily relate to the "likelihood of confusion" between a plaintiff's and a defendant's *products*. Here, however, as in *Boston Pro. Hockey*, the confusion stems not from the defendant's unfair competition with the plaintiff's *products*, but from the defendant's misuse of the plaintiff's reputation and good will as embodied in the plaintiff's mark.[29] Therefore, under the circumstances, the nonexistence of these three factors does not undermine the district court's finding of a "likelihood of confusion."

## III. CONCLUSION

The "Battlin' Bulldog's" football career thus comes to an abrupt end. Laite devised a clever entrepreneurial "game plan," but failed to take into account the strength of UGAA's mark and the tenacity with which UGAA was willing to defend that mark. Like the University of Georgia's famed "Junkyard Dog" defense, UGAA was able to hold its opponent to little or no gain. Because we find that the district court did not err, in fact or in law, when it granted permanent injunctive relief to UGAA, we hereby AFFIRM.

---

one of the member clubs in order to manufacture the jerseys").

Furthermore, in our view, most consumers who purchase products containing the name or emblem of their favorite school or sports team would prefer an officially sponsored or licensed product to an identical non-licensed product. Were this not true, the word "official" would not appear in so many advertisements for such products.

**29.** In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979), the court emphasized that "[t]he trademark laws are designed not only to prevent consumer confusion but also to protect 'the synonymous right of a trademark owner to control his product's reputation.'" *Id.* at 205 (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976) Markey, C.J.).