**BELL LABORATORIES, INC., Plaintiff,**

v.

**COLONIAL PRODUCTS,
INC., Defendant.**

No. 85–8574–Civ.

United States District Court,
S.D. Florida,
Miami Division.

July 3, 1986.

J. Rodman Steele, Jr., Steele, Gould & Fried, West Palm Beach, Fla., Patrick J. Casey, Boone, Casey, Ciklin, Lubitz, Martens, McBane and O'Connell, West Palm Beach, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

HOEVELER, District Judge.

THIS CAUSE came on for hearing upon the Plaintiff's Motion for Preliminary Injunction, and the Court having twice heard argument on the matter and being otherwise fully advised in the premises,

IT IS ORDERED AS FOLLOWS:

### FACTS

Plaintiff, Bell Laboratories, Inc., (hereinafter "Bell") is a Wisconsin-based national marketer of pesticides and rodenticides. Plaintiff is the owner of trademark registration No. 1,110,733 for the mark "FINAL." Defendant, Colonial Products, Inc., is a Florida corporation that markets pesticide products. Defendant began in October, 1985, to market a rodenticide known as "FINAL FLIP." Plaintiff has sued defendant for trademark infringement and false designation of origin under 15 U.S.C. § 1125(a), violation of the Florida anti-dilution statute, § 495.151, Fla.Stats., and for common law unfair competition and trademark infringement.

Plaintiff's mark "FINAL" was adopted in 1974, registered in 1979, and became incontestible in 1984. Sales in 1985 of the warfarin-based rat poison were projected at $225,000. Sales of plaintiff's product "FINAL" are primarily to professionals in pest control. Defendant Colonial markets its pesticides primarily through consumer retail market channels. Colonial's application for registration of the mark "FINAL FLIP" for its bromodioline-based rodenticide is currently pending before the U.S. Patent and Trademark Office.

Plaintiff relies upon 15 U.S.C. § 1125(a) for its claim of false designation of origin:

Jack E. Dominik, Dominik-Saccocio, Miami Lakes, Fla., for plaintiff.

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or likely to be damaged by the use of any such false description or representation."

Additionally, Plaintiff relies upon the Florida anti-dilution statute, § 495.151, Fla. Stats.:

"Injury to business reputation; dilution. —Every person, association, or union of workingmen adopting and using a mark, tradename, label or form of advertisement may proceed by suit, and all courts having jurisdiction thereof shall grant injunctions. to enjoin subsequent use by another of the same or any similar mark, tradename, label or form of advertisement if it appears to the court that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, tradename, label or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of the goods or services."

Plaintiff asserts that even though the parties are basically not in direct competition with each other, since Bell primarily sells directly to pesticide professionals and Colonial primarily sells through consumer retailers, the likelihood of confusing the names of the two products gives rise to circumstances which are injurious to Plaintiff and which should be preliminarily enjoined.

■ A preliminary injunction will be entered by the district court only if the moving party meets its burden of proof as to the following prerequisites:

(1) a substantial likelihood that plaintiff will prevail on the merits;

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;

(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and

(4) that granting the preliminary injunction will not disserve the public interest. See Shatel Corp. v. Mao Ta Lumber and Yacht Corp., 697 F.2d 1352 (11th Cir.1983); Global Tool Corp. v. L & N Sales & Marketing, 586 F.Supp. 883 (S.D.Fla.1984).

## LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff argues that it has shown a substantial likelihood of success on the merits by demonstrating a strong possibility of confusion, incontestability of its mark, and defendant's improper motive for adoption of a mark similar to Plaintiff's.

■ A number of factors must be considered by the Court in determining whether there is a likelihood of confusion between two products. These factors include (1) the strength of the mark, (2) relatedness of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser's care, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. See Frisch's Restaurant, Inc. v. Shoney's Inc., 759 F.2d 1261 (6th Cir.1985); University of Georgia Athletic Association v. Laite, 756 F.2d 1535 (11th Cir.1985); Amstar Corp. v. Domino's Pizza, 615 F.2d 252 (5th Cir.1980), cert. denied, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

On the issue of the strength of plaintiff's mark, defendant urges the Court to view the "FINAL" mark as a weak mark. Trademarks can be divided into four cate-

gories of distinctiveness. In descending order, there are arbitrary and fanciful marks, suggestive marks, descriptive marks and, finally, generic marks. 1 J. McCarthy, *Trademarks and Unfair Competition,* § 11.1 (1973). An example of an arbitrary and fanciful mark would be Kodak or Xerox, or Exxon, a name generated randomly by a computer. The second category of mark, suggestive marks, "require imagination, thought and perception to reach a conclusion as to the nature of the goods," *Stix Products, Inc. v. United Merchants and Manufacturers,* 295 F.Supp. 479, 488 (S.D.N.Y.1968), and actually suggest some quality of the goods or services. 1 McCarthy, *supra,* at § 11.20. Descriptive marks, the third category, describe the qualities, ingredients, intended purpose, function, use, or characteristics of the product or service. 1 McCarthy, *supra,* at § 11.5.

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Stix Products,* 295 F.Supp. at 488. Generic marks simply refer "to the genus of which the particular product is a species." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

■ The distinctiveness of a mark is to be determined contextually, by reference to the goods or services for which the mark is used. *See* McCarthy, *supra,* § 11.20 at 489. Defendant contends that the mark "FINAL", used in the context of a rodenticide, is descriptive rather than suggestive, since it describes a final solution to a common pest problem. Plaintiff's use of "FINAL" to allude to the cessation of the animal's life (and perhaps the homeowner's discomfort) which follows the administration of the poison is consistent with the dictionary definition of "final":

> an adjective: (1) pertaining to the end or conclusion, last, ultimate, as the final issue, final hope, final solution; (2) con-

clusive, decisive, determinative, as a final judgment, (3) of purpose, result, and as a noun ... the termination, the last. Webster's International Dictionary (2nd ed.). The dictionary definition is relevant when categorizing a mark as descriptive or suggestive because it supplies the ordinary meanings of a word. *See, e.g., Litton Business Systems, Inc. v. J.G. Furniture Co.,* 196 USPQ 711 (TTAB 1977). In the instant cause it is apparent that "FINAL" is a descriptive, or at best a weak suggestive mark, since the mark's owner cannot but intend it to connote the ordinary effect of a poison against a pest. A descriptive mark is often a relatively weak mark, and therefore, is not accorded a wide degree of protection. *See Sun Banks of Florida v. Sun Federal Savings & Loan Ass'n.,* 651 F.2d 311 (5th Cir.1981); *Jean Patou, Inc. v. Jacqueline Cochran, Inc.,* 201 F.Supp. 861 (S.D.N.Y.1962), *aff'd.,* 312 F.2d 125 (2d Cir. 1963).

■ Defendant contends that extensive third-party usage of the word "final" has seriously eroded the scope of protection to be given to the mark. Defendant has provided the Court with a listing of over 100 marks registered with the U.S. Patent and Trademark Office that use the word "final". *See In Re Capital Formation Counselors, Inc.,* 219 USPQ 916 (1983). Comment (g) to § 729 of the Restatement of Torts states that "the greater the number of identical or similar trademarks already used on different kinds of goods, the less is the likelihood of confusion...." A review of the pertinent caselaw shows that mere following usage by one party of a word contained in a mark of another party does not, without more, require a finding of likelihood of product or source confusion.

■ In *Pacquin-Lester Co. v. Charmaceuticals, Inc.,* 484 F.2d 1384, 1385 (CCPA 1973), the court held that appellant Pacquin-Lester Co., a marketer of beauty and bath lotion and oil for hands and skin under the registered mark SILK'N'SATIN, could not prevent appellee Charmaceuticals, Inc. from registering the mark SILK to be used for face cream. Despite the close related-

ness of the goods, the court found that the marks had "obvious substantial differences ... enough to prevent any reasonable likelihood of confusion, mistake or deception when the marks are applied to the respective goods ...," especially in light of third party usage in the emollient field.

In *Interstate Brands v. Celestial Seasonings*, 576 F.2d 926 (CCPA 1978), appellant Interstate Brands, marketer of ZINGERS cakes (registered mark), opposed appellee Celestial Seasonings' application for registration of its mark RED ZINGER for herbal tea. The court found for appellee, holding that the applicant's mark had to be considered in its entirety, and the presence of the word "RED" could not be dismissed as an identifying factor sufficient to distinguish it from appellant's mark ZINGER. The court took into account nine third-party registrations, in accordance with the dictionary usage, of the formative "ZING–" as applied to various food and drink products.

In *EZ Loader Boat Trailers v. Cox Trailers, Inc.*, 706 F.2d 1213 (Fed.Cir.1983), the court affirmed the decision of the Trademark Trial and Appeal Board dismissing appellant EZ Loader's (marketer of boat trailers with the marks EZ LOADER and MINI LOADER) opposition to appellee Cox Trailers' proposed registration of the mark SUPER LOADER for a boat trailer. The Board held that it was appropriate to consider "that a portion of a mark (common to a corresponding portion of the mark of the other party) may be used in the sense that it is descriptive, highly suggestive or in such common use by other traders in the same market as to not have very much effect in distinguishing source." *Id.* at 1214. Despite finding that the case was close, the products were the same and were distributed through the same channels of trade to the same customers, the court upheld the Board's denial of the opposition to the latecomer mark SUPER LOADER. While the Board found that the competing marks were intended to convey different meanings, it also found that the use of the word "loader" would not be strongly protected because it was both a weak mark (highly descriptive) and enjoyed common

usage. Such is the case with the word "final" in the instant cause. *See also Hot Shoppes, Inc. v. Borden Co.*, 404 F.2d 999 (CCPA 1969).

In *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F.Supp. 1003, 1015 (E.D.Pa.1976), the court decided that defendant's use of the mark "CHIP–CHIP" for boys' clothing infringed upon plaintiff's use of the earlier registered mark "CHIPS" for boys' clothing.

The products were the same and there was considerable overlap in the markets and channels of trade through which Chips' goods and Chip-Chips' goods were sold. There was also considerable overlap between those who purchased plaintiff's goods and those who purchased defendant's goods. The court, however, considered as well defendant's argument that the marks' aural characteristics were easily distinguishable such that confusing similarity was unlikely. As the court phrased it, "The question is whether the pronunciation of the sound 'Chip-Chip' generates an auditory response that calls to mind or may be confused with the sound 'Chips.' I conclude that it does." *Id.* at 1015.

Subjecting the two marks in the instant case to the same auditory characteristics test, it is the conclusion of this Court that "FINAL FLIP" is distinguishable from "Final" by the second distinctive word "FLIP," a word that is less used and less obviously descriptive than the word "FINAL." Further, "FLIP" can fairly be categorized as a suggestive term, one which is in keeping with defendant's family of marks. Defendant's mark "FINAL FLIP" manages to pass the auditory comparison test employed in *Chips 'N Twigs, supra.*

In *Schmid Laboratories v. Youngs Drug Products Corp.*, 482 F.Supp. 14 (D.N.J.1979), the court had to decide whether defendant's use of the term "RIBBED" on its condom packaging infringed upon plaintiff's use of the registered mark "SENSI–RIBBED" on its condom packaging. In determining likelihood of confu-

sion, the court considered the following factors:

1) degree of resemblance between the marks in appearance, pronunciation, translation and suggestiveness.

2) intent of the second user in adopting the allegedly infringing mark.

3) similarity of circumstances and conditions surrounding the purchase of the goods involved.

4) degree of care likely to be exercised by purchasers.

*See Motor Master Products Corp. v. Motor Masters,* 446 F.Supp. 165, 168 (E.D. Pa.1978); *Alfred Dunhill of London, Inc., [v. Kasser Distillers Products Corp.,] supra,* 350 F.Supp. [1341] at 1363 [(E.D.Pa.1972)]; Restatement of Torts 2d § 729.

As to the degree of similarity in pronunciation, the court found that "RIBBED" does not sound like "SENSI–RIBBED" when recited. Both contain the one-syllable word "RIBBED" but are readily distinguished by the two-syllable prefix "SEN-SI–" in plaintiff's mark.

In the instant case, "FINAL" and "FINAL FLIP" are perhaps more similar sounding than "RIBBED" and "SENSI–RIBBED" by virtue of both the alliterativeness of the words and the secondary position of the distinguishing word "FLIP." They are, however, ultimately different and different sounding. The mark "FINAL" conveys a sense of finality and terseness (that the offending rodent is to be dispatched summarily), that is brought out by the use of a single no-nonsense word. Defendant's mark "FINAL FLIP," on the other hand, describes a slightly more casual approach to the vermin problem.

The appearance of the marks in the instant cause is quite different. Plaintiff's mark boldly highlights the word "FINAL" in black against a white background with other black print. The letter "F" is capitalized and the other letters are lower case. The printing is stylized. There is little other ornamentation on the "FINAL" package save for the plainly printed phrase "Pelleted Rat and Mouse Bait." Defend-

ant's packaging is very different from plaintiff's. The paper "header" attached to the package contains bright red and yellows. The words "FINAL FLIP" are capitalized throughout in standard unstylized block letters. The exclamation "Rats & Mice Love It!" is prominently featured, as is a cartoon of a sneering gloved rat swiping an ear of corn. The packages do not appear likely to cause the average consumer, presumably fairly skilled at linking or discerning products through visual similarities or differences, confusion as to source. This is so especially if the individual retail consumer is aware of and has seen a package of "FINAL" (a product mainly sold to professionals in the trade, which is then left in its packaged form in the consumer's home).

Plaintiff asserts that householders become aware of "FINAL" directly because even though the product may initially be administered by the exterminator, packages are often left in the home in plain view and extras are left so the householder can refill the traps. Plaintiff's position is that once a consumer learns of "FINAL" he might accidentally purchase "FINAL FLIP" when he really wants and thinks he is buying "FINAL." This contention is undercut somewhat by the rather striking visual dissimilarity between the packaging.

As to the intent of the defendant's adoption of the allegedly infringing mark "FINAL FLIP," plaintiff contends that past dealings between the parties show defendant's improper motive. Plaintiff stated that in 1983, defendant improperly used a registered mark, "RIVAL," belonging to plaintiff's sister company, Motomoco. Defendant ceased and desisted using the mark upon request by plaintiff. Defendant explains that it adopted the mark "FINAL FLIP" to distinguish its warfarin-based rodenticide "RAT FLIP" from the newer, more effective bromodioline-based product "FINAL FLIP." While warfarin-based rodenticides require several feedings before the animal dies, bromodioline based products achieve the desired effect after a single feeding. Thus, for the purposes of

ruling on this motion for preliminary injunction, defendant's intent appears to be based upon a legitimate motive (although the earlier "RIVAL" incident between Motomco and Colonial admittedly casts some doubt on this conclusion).

Defendant additionally bases its argument in opposition to plaintiff's motion for preliminary injunction upon the extensive third party use of the adjective "final" or variations thereof. In *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 448 (5th Cir.1973), the court considered whether the marks "Holiday Out," "Holiday Out In America" and "The National Campground" used by defendant Holiday Out In America caused a likelihood of confusion or misunderstanding as to the source of defendant's services.

In ruling against plaintiff Holiday Inns, Inc., the court discussed the usage of the word "Holiday" throughout the United States to designate motels and restaurants not affiliated in any way with plaintiff Holiday Inns, Inc. The court concluded "[t]he common word 'Holiday' is of weak trademark significance." *E.g., El Chico Inc. v. El Chico Cafe*, 214 F.2d 721, 725 (5th Cir. 1954) (27 trademark registrations of "El Chico," along with the fact that it was the name of a Moorish King of Granada in 1482, and is the name of a Mexican town and a river in the Philippines, make the term a weak trade name deserving limited protection.); *see also American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3 (5th Cir.1974).

In *Armstrong World Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir.1979), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979), the appellate court reversed the district court's finding that carpet-manufacturer plaintiff's use of its proposed corporate name ("Armstrong World Industries, Inc.") would create a likelihood of confusion with defendant World, World's products, or any other aspect of World's business. The court observed *inter alia* that the widespread use of the word "World" in the carpet business militated against the finding of likelihood of

confusion (citing Restatement of Torts § 729, Comment (g), at 596 (1938).)

In *Sun Banks of Florida v. Sun Federal Savings and Loan Ass'n*, 651 F.2d 311 (5th Cir.1981), the Fifth Circuit Court of Appeals reversed the district court's order permanently enjoining Sun Federal from using the name "Sun" either with or without the orange sun logo in the advertising and promotion of banking services. The court found the extensive third-party use of the word "Sun" impressive evidence that there would be *no* likelihood of confusion between Sun Banks and Sun Federal.

The court further found that the mark "Sun Banks" came within the general rubric reported in 3 Callmann, *Law of Trademarks* § 82.1(i), at 722:

Whether an addition is sufficient to prevent confusion in a particular instance depends upon the strength of the main part of the mark and the distinctiveness of the additional feature. Where a trademark is itself weak, minor additions may effectively negate any confusing similarity. Thus, for example, the word or representation of the sun is so weak a trademark that the word "Sun-proof" was held to be sufficiently distinct from "Sunset" and "Sun Glo".... *See Patton Paint Co. v. Sunset Paint Co.*, 290 F. 323 (D.C.Cir.1923) ("Sun-Proof" versus "Sun Glo"); *Patton Paint Co. v. Sunset Paint Co.*, 290 F. 326 (D.C.Cir. 1923) ("Sun-Proof" versus "Sunset").

In the instant cause the Court makes a preliminary finding that the mark "FINAL" is weak. Thus, the addition of the word "FLIP," a distinctive word, effectively negates any confusing similarity between the marks "FINAL" and "FINAL FLIP". *See Sun Banks*, 651 F.2d at 316.

Plaintiff relies upon *State Historical Society of Wisconsin v. Ringling Bros.— Barnum & Bailey Combined Shows, Inc.*, 190 USPQ 25 (TTAB 1976), in support of its motion. The Board in *State Historical Society* sustained the Historical Society's opposition to the proposed registration of the mark "CIRCUS WORLD" by applicant Ringling Bros.-Barnum & Bailey. The His-

torical Society, a state agency, operated the Circus World Museum in Baraboo, Wisconsin. Ringling Bros. desired to register "CIRCUS WORLD" as a service mark to designate a circus which would provide entertainment. The issue before the Board was whether the contemporaneous performance of the respective services of the parties under the marks was likely to cause confusion. Ringling Bros. contended that neither the Historical Society nor its affiliate, "CIRCUS WORLD MUSEUM," was authorized to conduct circus performances as entertainment since the CIRCUS WORLD MUSEUM'S activities were mainly directed towards educational and research functions (the animal acts being incidental thereto). Ringling Bros.' position was that because the services provided by the entities were fundamentally unrelated, no reasonable likelihood of confusion could result from its contemporaneous use of opposer's mark "CIRCUS WORLD."

The Board found that under the Wisconsin statute setting forth the duties and powers of the State Historical Society, the opposer Historical Society was empowered to "perform such tasks as are necessary for the success of the project [i.e., the circus museum and library at Baraboo]" and to "encourage in every possible way an appreciation of the role of the circus in American life." The Board concluded that under the above language it was not shown that CIRCUS WORLD MUSEUM could not conduct circus shows as entertainment. In ruling that there was a likelihood that the public would be misled into the belief that the services of the parties originated from a common source, the court found that the services were manifestly related and that Ringling Bros. had appropriated the salient portion of the Historical Society's mark without creating a mark which was substantially different therefrom. Also considered was Ringling Bros.' knowledge of the Historical Society's prior use of the "CIRCUS WORLD MUSEUM" mark and the employment by Ringling Bros. of the Museum's former director and president.

The instant cause is distinguishable from *State Historical Society* since defendant Colonial here *has* created a mark which is substantially different from plaintiff's mark. *See Sun Banks,* 651 F.2d at 316.

In *Glamorene Products Corp. v. Procter & Gamble Co.,* 190 USPQ 543 (CCPA 1976), the court considered whether the contemporaneous use of BOUNCE BACK by Glamorene for an aerosol rug cleaner and BOUNCE by Procter & Gamble (P & G) for a detergent and fabric softener would be likely to cause confusion or mistake. In proceedings before the Trademark Trial and Appeal Board, P & G (BOUNCE) successfully opposed the registration of Glamorene (BOUNCE BACK). In affirming the Board's decision, the court determined that the marks conveyed substantially the same commercial impression. The court further noted the complete lack of third-party usage of BOUNCE and concluded that BOUNCE clearly served as an indication of origin of a product and qualified as a strong trademark. Glamorene argued that because the products were sold through different channels of trade, the marks were capable of commercial coexistence without any likelihood of confusion. The court discounted the argument, however, on the ground that a distributor might simultaneously handle both Glamorene's and P & G's products.

In the instant cause, the Court has determined that "FINAL" is not a strong mark and that it is used extensively by other marketers for a wide variety of products. In cases like the one at bar, the strength of the mark in question is invariably a decisive factor. Indulging for a moment in a hypothetical scenario, if plaintiff's product were called "Deathsqueak" or "Belly-up", or even "Begone, Cheeseseeker!," the Court would have little difficulty enjoining the use of the mark "Deathsqueak Extra" or "Begone, Cheesesearcher!," etc. However, plaintiff's mark is weak, and thus is not entitled to the protection extended to the mark BOUNCE against BOUNCE BACK in *Glamorene Products, supra.*

Further, this Court will not ignore the restrictions placed upon both plaintiff's and

defendant's products by Chempar, the supplier of bromodioline to both companies. Under Chempar's agreement with Colonial, Colonial is forbidden to sell "FINAL FLIP" to the professional pest control operator market. Conversely, plaintiff is forbidden, under its sales agreement for bromodioline, to sell in the consumer retail market. Thus, in the instant cause, the plaintiff's market segment is forbidden to defendant under a sales agreement entered into between defendant and the supplier of its product's main ingredient. Although the relative weakness of plaintiff's mark militates against the entry of an injunction against defendant's mark in any event, that the respective products are sold in different market segments is another factor militating against the issuance of the injunction.

In *Safeway Stores Inc. v. Safeway Discount Drugs, Inc.*, 216 USPQ 599 (11th Cir.1982), the appeals court ruled that defendant's use of the SAFEWAY name in connection with its drugstores constituted a violation of trademark laws and remanded to the district court with instructions to enjoin defendant from further use of the word SAFEWAY. The court specifically concluded that SAFEWAY was a strong mark with the qualities of a suggestive mark. In addition, the court found that the design of the marks involved was similar, there was significant overlap in each company in the goods that were dominant sales items of the other, and most importantly, evidence of actual confusion.

In the instant cause, it is reiterated that plaintiff's mark is not a strong mark and the evidence adduced to date reveals different marketing and advertising strategies, and different designs of the subject marks. No evidence of any confusion in the marketplace has been shown by plaintiff.

The Court here notes that plaintiff has not met the "likelihood of success on the merits" requirement for preliminary injunction as to its federal trademark claim. Neither has it met the above requirement on its anti-dilution claim under § 495.151. The anti-dilution statute prevents persons from

"diluting" the distinctiveness and value of a trademark by using it on products and services completely different from the original product or service. *See Freedom Savings and Loan Ass'n v. Way*, 757 F.2d 1176 (11th Cir.1985) at 1186. If a plaintiff holds a distinctive trademark, it is enough that a defendant has made significant use of a very similar mark. But if the mark is a weak one that lacks much distinctiveness, as is the case in the instant action, the mere use of a similar mark will not establish loss of commercial value. *Id.*

### IRREPARABLE HARM TO PLAINTIFF

Plaintiff has relied primarily upon case law holding that a showing of likelihood of success on the merits establishes as well the risk of irreparable harm. *See Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704, 216 USPQ 841 (2d Cir.1982); *Camp Beverly Hills, Inc. v. Camp Central Park, Inc.*, 217 USPQ 783 (S.D.N.Y.1982). It must be noted here that as plaintiff has not made the requisite showing of a likelihood of success on the merits, it fails as well on the irreparable harm prong of the test. Plaintiff has not shown any harm to date, either by evidence of monetary loss or consumer confusion, that independently warrants the issuance of an injunction against defendant.

### HARM TO DEFENDANT IF INJUNCTION ISSUED

While plaintiff has not shown the Court any evidence of monetary loss or actual confusion, defendant has shown the Court evidence that it stands to lose an estimated $50,000 if the injunction is issued. (Defendant's estimate takes into account the costs of artwork, printing, warehousing, re-registration, cataloguing, labor, etc., and the costs of marketplace absence and loss of dealer goodwill.) Defendant's president has testified about the corporation's financial outlook to the effect that should Colonial be made to swallow the losses resulting from FINAL FLIP's injunction, its very existence would be "very questionable." The Court notes that for the purposes of

this motion, the balance of the equities involved appears to be in defendant's favor. *See Arco Fuel Oil Co. v. Atlantic Richfield Co.*, 427 F.2d 517 (2d Cir.1970).

## CONCLUSION

For the reasons discussed above, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Motion for Preliminary Injunction be and the same is hereby denied.