The **BREAKERS OF PALM BEACH, INC., Plaintiff,**

v.

**INTERNATIONAL BEACH HOTEL DEVELOPMENT, INC., d/b/a The Breakers of Fort Lauderdale, Defendant.**

**No. 91–8041–CIV.**

United States District Court,
S.D. Florida,
West Palm Beach Division.

June 15, 1993.

J. Rodman Steele, Jr., Quarles & Brady, West Palm Beach, FL, for plaintiff.

Barry L. Haley, Malin, Haley, DiMaggio & Crosby, Fort Lauderdale, FL, for defendant.

## FINAL ORDER ON MOTION FOR PERMANENT INJUNCTION

ROETTGER, Chief Judge.

Plaintiff's complaint seeks injunctive relief claiming infringement of its trade name and service mark. The court makes the following findings of fact and conclusions of law.[1]

---

1. Following evidentiary hearings, additional memoranda were submitted to the court. The court has also considered the argument of counsel, exhibits and evidence presented, memoranda of law, and the entire record in this cause.

## FINDINGS OF FACT

Plaintiff, The Breakers of Palm Beach, Inc., (hereafter The Breakers) owns and operates The Breakers Hotel, a world-renowned luxury hotel located in Palm Beach, Florida.

The name "The Breakers" has been employed by Plaintiff since 1903, when it was first used by the Florida East Coast Hotel Company, Plaintiff's predecessor in interest, as the hotel's trade name, trademark and service mark.[2]

With a diffidence perhaps not atypical of Plaintiff, it was not until January 16, 1990, that Plaintiff acquired federal registration number 1,578,368 for the service mark "The Breakers," for use in connection with hotel services. This mark consists of the words "The Breakers" in large block capital letters, sometimes appearing in conjunction with a logo of two waves.

The Breakers hotel is located on beachfront property on South County Road in Palm Beach, Florida. It is widely regarded as a luxury hotel of world class quality, which hosts dignitaries and royalty, as well as several gala charity events each year.

Defendant admits "there's only one distinct Breakers," and stipulated to the renowned status of The Breakers.

Over the years Plaintiff has spent millions of dollars cultivating this image and reputation. The Breakers' annual advertising budget is approximately 2.6 million dollars, one half of which is devoted to national and international media advertising.

The Breakers has a separate internal sales and marketing division which is responsible for persuading tour operators and travel agents to send their clients to The Breakers. Approximately ninety percent of The Breakers' summer business is derived from customers within the state of Florida, whereas the winter business is derived mostly from northeastern tourists.

Defendant, International Beach Hotel Development, Inc., owns and operates a hotel doing business as "The Breakers of Fort Lauderdale." This hotel is located 43 air miles south of Palm Beach at 909 Breakers Avenue, Fort Lauderdale, Florida, at the intersection of Sunrise Boulevard and Breakers Avenue, one block from the ocean. Defendant advertises itself as a "luxury suite hotel."

Defendant's original name was "Sunrise Breakers Condominium Apartments," which it began using in 1972. Defendant also began to offer time-share services. In 1984 Defendant's property was converted from a condominium and time-share operation to a hotel and began doing business under the name "The Breakers of Fort Lauderdale."

Defendant's service mark consists of the words "the Breakers" in large lettering next to a sailboat, with the words "of fort lauderdale" printed in significantly smaller type just below.

Defendant offers suite-style hotel rooms with kitchens, proximity to the ocean, heated pool, jacuzzi, meeting rooms, restaurant, concierge, entertainment and a health and beauty center. The majority of Defendant's customers come from tour operators and travel agents. A tour operator from M–R–S MARKETING, which sends its guests to The Breakers of Fort Lauderdale in conjunction with a cruise package, stated that the Breakers of Fort Lauderdale offers "everything the Palm Beach property offers."

The Breakers of Fort Lauderdale spends approximately ten thousand dollars each year advertising, mainly in the Fort Lauderdale *Sun–Sentinel* and other local papers, and on direct mail advertising promotions targeting tour operators and agents.

While The Breakers of Fort Lauderdale does not specifically encourage its employees to mislead the public or tour agents regarding its lack of affiliation with The Breakers of Palm Beach, it also takes no steps to disclaim any affiliation.

---

**2.** A "trademark" identifies and distinguishes a product, a "service mark" a service, and a "trade name" a business. Trade names are protected at common law but are not registrable. Sometimes use of a word overlaps among these categories. Technically, Plaintiff has a registered service mark. *Safeway Stores, Inc. v. Safeway Discount Drugs,* 675 F.2d 1160, 1163 (11th Cir.1982).

Several witnesses testified about various incidents of confusion which arose between the two marks.

Since 1984, Defendant has placed advertisements in the *Sun–Sentinel.* In December, 1989, Defendant placed an ad with the *Sun–Sentinel* promoting a Christmas Day dinner and New Year's Eve function. Plaintiff's trademark (the words "The Breakers" in large block capital letters accompanied by two waves) appeared in this particular ad instead of Defendant's name and logo.

Another ad placed by Defendant for a job opening directed applicants to apply at 909 Breakers Avenue, at "the Breakers Hotel," but did not say The Breakers of Fort Lauderdale. An interested applicant appeared at Plaintiff's hotel to apply for the job.

Defendant's Director of Sales, Ms. Diane Fairchild, has received at least three faxes during her four years of employment from persons who were clearly attempting to communicate with Plaintiff.

Ms. Andrea Dunn, former reservations manager for The Breakers of Fort Lauderdale, testified that approximately ten percent of the people who called the hotel to make reservations asked if there was a relationship between the two hotels.

Mr. Lance Dickinson, former front desk clerk for The Breakers of Fort Lauderdale testified that incidents of confusion amongst the guests occurred on a "regular basis." Mr. Dickinson received regular inquiries from guests and persons who asked if Defendant's hotel was affiliated with Plaintiff's. Furthermore, time-share guests inquired about the affiliation just as frequently as other guests. Prior to his employment with Defendant, when Mr. Dickinson worked for Treasure Tours as a hotel representative, he too assumed the hotels were "part of each other."

Mr. Thomas P. Wickey, President and Chief Operating Officer of The Breakers of Palm Beach, testified that one of his guests flew from New York to Fort Lauderdale, and was taken to Defendant's hotel by the cab driver; this delayed the guest by almost an hour and a half, causing him to arrive "very upset" at The Breakers at two o'clock in the morning.

Ms. Martha Heagany, Director of Travel Industry Sales at The Breakers, is responsible for booking all leisure and non-convention business for the hotel. She described an incident in which a tourist was mistakenly taken to Defendant's hotel instead of Plaintiff's.[3] Ms. Heagany testified further that a guest of Plaintiff's, Ms. Carol Bresner, was mistakenly booked by a travel agent at The Breakers of Fort Lauderdale instead of at Plaintiff hotel and that she was "very upset."

Ms. Nancy Pinto, a reservationist at The Breakers, explained that in the six months she had been working there, she received three mistaken phone calls. One caller in particular inquired about a $170.00 rate which is not available at The Breakers. He became irate when she told him he could not stay at The Breakers for $170.00 per night, nor for $200.00 for two nights or $300.00 for three nights, which was a special rate the caller wanted. Ms. Pinto later learned those were the rates being offered by The Breakers of Fort Lauderdale.

Mr. Luis Eduardo Saravia, a front desk clerk at The Breakers, received a call from a guest seeking to confirm her reservation. He could not find her name on the reservations lists, and later learned she in fact had a reservation at The Breakers of Fort Lauderdale. She had intended to stay at Plaintiff's hotel.

Ms. Elaine Wilson, a travel agent with 36 years' experience, explained that a city's tourist development board spends a great deal of time and money cultivating a certain image and reputation. Fort Lauderdale has acquired the reputation of being a fun place for young people, while Palm Beach caters to a "staid, wealthier" clientele. According to Ms. Wilson, professionals in the travel industry would not confuse The Breakers with any other hotel in the city. However, during his employment as a hotel representative for a

---

**3.** The customer believed he was misled. He was told by Defendant's agent that "they have a prop-    erty in Palm Beach and Fort Lauderdale."

tour operator, Mr. Dickinson assumed the hotels were related.

Also, Ms. Heageny testified that while attending a trade show in January, 1990, where she represented The Breakers, some tour operators and travel agents were confused between Plaintiff's and Defendant's booths and asked if the hotels were related.

Ms. Heagany also received two telephone inquiries, one from Boston and one from Orlando, regarding a cruise-hotel package which the former learned about from a tour operator and the latter from the local newspaper. The Breakers offered no such package; however, The Breakers of Fort Lauderdale did.

Ms. Brigida Olarte, an employee of Defendant's counsel, telephoned twelve properties within Florida which use the word "breakers" in their name to ascertain how they answered the phone and the type of service they offered. Of these twelve, only one, The Breakers Beach Motel in Daytona Beach offers hotel services; the others were condominiums or rental apartments. Similar phone calls were placed to hotels outside Florida.

## CONCLUSIONS OF LAW

In this action, The Breakers seeks to enjoin The Breakers of Fort Lauderdale from using the phrase "The Breakers" in its name.[4] The following conclusions of law are made with respect to each of the claims in the complaint.

## THE LANHAM ACT

■ The purpose of trademark law is to identify goods or services in the marketplace as originating from a particular source, and to protect the consuming public from being deceived by "palmed off" goods or services. A trademark is "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown...." 15 U.S.C. § 1127. Section Three of the Lanham Act provides for the registration and protection of service marks to the same extent as trademarks. 15 U.S.C. § 1053.

■ Plaintiff sued Defendant under Sections 32 and 43 of the Lanham Act to enjoin Defendant's use of the name "The Breakers." Count I of the complaint raises an infringement claim under Section 32(1)(a) of the Lanham Act. 15 U.S.C. § 1114(1)(a). This section prohibits the unauthorized use in commerce of a registered trademark in a manner which is likely to cause confusion to the consuming public.[5] In order to prevail on a trademark infringement claim, plaintiff-registrant must demonstrate (1) that its mark was used in commerce by defendant without consent of plaintiff, and (2) that this unauthorized use was likely to cause confusion or mistake, or to deceive. *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir.1983).

■ Count II is a false designation of origin claim arising under Section 43(a) of the Lanham Act. 15 U.S.C. § 1125. This section prohibits a broader range of practices than Section 32, which protects only registered marks. *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992); *Sun–Fun. Products, Inc. v. Suntan Research & Development*, 656 F.2d 186, 192 (5th Cir., Unit B,

---

4. This court has subject matter jurisdiction over the Lanham Act claims (15 U.S.C. §§ 1114(1)(a) and 1125(a)) pursuant to 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121. The court has jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1338 and the doctrine of supplemental jurisdiction. The court has personal jurisdiction over the parties. Venue lies in this District as Defendant is located and does business here, and the claims of Plaintiff arose here. 28 U.S.C. § 1391.

5. The section provides in full:

> Any person who shall, without the consent of the registrant, use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.
>
> 15 U.S.C. § 1114(1)(a).

1981).[6] The prohibited behavior includes the use in commerce of a mark or symbol which misleads or causes confusion as to the source or commercial affiliation of a product or service.[7] Thus, a trademark infringement case need not involve only imitation of the registered mark. The unauthorized use of a mark which misleads the public into believing the user is sponsored or approved by the owner of the registered mark may also constitute infringement. *Burger King Corp.*, 710 F.2d at 1492. To prevail on this claim, Plaintiff must demonstrate (1) that it is the prior owner of the mark, and (2) that the defendant's trade name or service mark is the same or confusingly similar to plaintiff's so that there exists a likelihood of confusion to consumers as to the proper origin of the services, such that a consumer is likely to believe that defendant's services are being sold with the consent or authorization of plaintiff, or that defendant is affiliated with plaintiff. *American United Life Insurance Co. v. American United Insurance Co.*, 731 F.Supp. 480, 481 (S.D.Fla.1990).

Thus, the common element Plaintiff must prove to prevail on both Lanham Act claims is "likelihood of confusion" between the marks. *Two Pesos, Inc.*, —— U.S. at ——, 112 S.Ct. at 2763 (test for liability under a section 43(a) claim is likelihood of confusion); *Safeway Stores, Inc. v. Safeway Discount Drugs*, 675 F.2d 1160, 1163 (11th Cir.1982) (claim of infringement of a service mark turns on likelihood of confusion).

■ In this Circuit the Court of Appeals has articulated a seven factor test to be applied in assessing whether there is likelihood of confusion between Plaintiff's and De-

fendant's marks. These factors are: (1) type of mark at issue, (2) similarity of design between the two marks, (3) similarity of product or service, (4) identity of retail outlets or consumers, (5) identity of advertising media utilized, (6) defendant's intent, and (7) actual confusion between the two marks. *Roto–Rooter Corp. v. O'Neal*, 513 F.2d 44 (5th Cir.1975); [8] *University of Georgia Athletic Assoc. v. Laite*, 756 F.2d 1535, 1542 (11th Cir.1985). The court will examine the applicability of each factor seriatim.

## (1) TYPE OF MARK

■ Trade and service marks fall into five basic categories. *Two Pesos, Inc.*, —— U.S. at ——, 112 S.Ct. at 2757. In increasing order of distinctiveness, and hence scope of protection, these categories are as follows: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful or coined. *Id.* It is imperative to determine accurately the type of mark at issue for this dictates the scope of protection afforded the mark.

■ Generic marks simply provide information about the nature or class of service and are not eligible for trademark or service-mark registration or protection. *University of Ga.*, 756 F.2d at 1540; *see also Kellogg Co. v. Nat'l. Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) ("shredded wheat" is a generic term and no one can acquire exclusive right to use it); *Freedom Savings & Loan Assoc. v. Way*, 583 F.Supp. 544, 550 (M.D.Fla.1984) ("butter" is a generic term and can never become a trademark).

■ Descriptive marks merely describe the product or service itself and are entitled

---

**6.** Opinions of the Fifth Circuit handed down on or before September 30, 1981, are established as precedent for the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1982).

**7.** Section 43 provides:
Any person who, on or in connection with any goods or services or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person, or (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).

**8.** See *supra* note 3.

to protection only if they have acquired a secondary, or distinctive, meaning. *Two Pesos, Inc.,* —— U.S. at ——, 112 S.Ct. at 2757.

■ Suggestive marks subtly connote something about the service or product. These marks require the exercise of the consumer's imagination. For example, the term "Penguin" as a trademark for refrigerators, or "Eskimo Pie" for ice cream bars, would be a suggestive mark. Although not as strong as arbitrary marks, suggestive marks will be protected without proof of secondary meaning. *University of Ga.,* 756 F.2d at 1540.

■ Arbitrary marks bear no relationship to the product or service, for example, use of the term "Apple" to sell computers. *Abercrombie & Fitch, Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 n. 6 (2nd Cir.1976) ("Ivory" would be generic mark if used to describe a product made of tusks, but would be arbitrary as to soap).

■ The final group includes coined or fanciful marks such as "Xerox" and "Kodak" which are completely original and are entitled to the broadest scope of protection. *Freedom Savings & Loan,* 583 F.Supp. at 550.

■ In the instant case, Plaintiff calls itself "The Breakers" and uses the symbol of a crashing wave. Defendant argues this mark is merely descriptive because it describes an important feature of the Plaintiff's property.[9] The court disagrees. A mark such as "The Inn" for a hotel might be descriptive, but "The Breakers" is suggestive because it stimulates the consumer to use his or her imagination to invoke an important aspect of the hotel, specifically, its oceanfront location. A suggestive mark is considered "strong" and entitled to protection without proof of secondary meaning. *Univ. of Ga.,* 756 F.2d at 1545.

■ While the words and symbols of a mark are important to evaluating its strength, the court must also consider third party use. *Safeway Stores, Inc.,* 675 F.2d at 1165. Unauthorized third party use does not

necessarily diminish the strength of a mark. *Id.* The significance of third party use is evaluated based on the entire name and symbol, the type of business in which it is used, and geographic location. *Id.*

■ Defendant presented evidence of twelve other properties in Florida, and several out-of-state properties, which use the terms "the Breakers" or "breakers" as part of their business names. However, unauthorized use of a mark does not necessarily render a mark weak. The proper inquiry is whether the third party use *significantly* diminishes the public's perception that the mark identifies services connected with the owner. *Univ. of Ga.,* 756 F.2d at 1545, n. 27. Defendant argues that twelve unauthorized uses within the state constitute "extensive" third party use; however, they do not suffice to diminish Plaintiff's mark. Cases which have found third party use to be a significant factor have involved substantially higher numbers than those involved in this case. *Sun Banks of Florida, Inc., v. Sun Federal Savings & Loan Ass'n.,* 651 F.2d 311, 316 (5th Cir.1981) (4400 users); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir.1980) (72 users).

■ The instant case is more analogous to *University of Georgia Athletic Association v. Laite,* 756 F.2d 1535 (11th Cir.1985) than to *Sun Banks* or *Amstar.* In *University of Georgia* the defendant produced a novelty beer can featuring an English bulldog wearing a sweater emblazoned with a capital letter "G" and carrying a football, all of which bore a remarkable resemblance to the University's mascot. At trial the defendant introduced evidence of fifty-six other schools using the English bulldog as its mascot. The court distinguished the other schools as being either geographically remote, using a different color scheme, or having names beginning with letters other than "G," with the remainder being so small in number as to be insignificant. *Id.* at 1545.

Likewise, in the instant case the out-of-state uses are geographically remote and ir-

---

9. Even if one would conclude Plaintiff's mark is merely descriptive, it has acquired a distinctive meaning as a premier resort. The court notices

it has been recognized as one of the half-dozen five-star rated resort hotels in America. See *Mobil Guide.*

relevant to a consumer seeking to stay at The Breakers in South Florida. It is highly doubtful that use of the term "breakers" by a hotel in Hawaii or New Jersey would cause a likelihood of confusion between the two marks at issue in this case and is not a significant third party use. The remaining twelve locations in Florida are either geographically remote from the Southeastern coast, where both Plaintiff and Defendant are located, or both offer a different kind of service. Of the twelve intrastate properties presented by Defendant, only one is in the hotel business: The Breakers Beach Motel in Daytona Beach, which is geographically remote—approximately 200 miles—from South Florida. Nine of the other properties are condominiums and two are rental apartment houses. Use of the term "breakers" in conjunction with buildings offering permanent housing does not diminish the plaintiff's use of the term "breakers" in connection with resort hotel (i.e., short term) services. Only Defendant's property runs a similar business with a similar name.

Defendant argues that Plaintiff's mark is weakened by the use of the term "breakers" by two properties which are located between Plaintiff's and Defendant's hotels: The Breakers Condominium in Pompano Beach and The Breakers on the Ocean in Delray Beach, which is a rental apartment house. Yet these uses, like the others, do not diminish Plaintiff's mark in the hotel industry. As stated earlier, the proper inquiry is whether the third party use *significantly* diminishes the public's perception that the mark identifies services connected with the owner. *Univ. of Ga.,* 756 F.2d at 1545, n. 27. Defendant has only pointed out that these uses exist, but has not demonstrated that they have any impact on the public's perception regarding the strength of Plaintiff's mark.

■ Finally, Plaintiff is not obligated to litigate against each and every potential infringer. *Wallpaper Manufacturer's Ltd. v. Crown Wallcovering Corp.,* 680 F.2d 755 (Fed.Cir.1982). Plaintiff initiated this suit shortly after learning of several incidents of confusion with Defendant's mark and hotel, and third party use is relevant only insofar as it diminishes Plaintiff's mark. The court

finds it does not. The court finds that "The Breakers" is a strong suggestive mark.

## (2) SIMILARITY OF DESIGN

■ In evaluating the similarity of the two designs, the court must look at the total effect of the design, not simply at individual words or symbols. *Freedom Savings & Loan Ass'n.,* 583 F.Supp. at 549; *Safeway Stores, Inc.,* 675 F.2d at 1165. Plaintiff's mark consists of the words "THE BREAKERS" in all capital letters sometimes appearing alone, other times in conjunction with the picture of a crashing wave. Defendant uses the words "the Breakers" written in both capital and lower case letters, with the words "of fort lauderdale" in much smaller type below, all accompanied by the picture of a sailboat.

■ Defendant's use of the words "of fort lauderdale" below the prominently featured words "The Breakers" is not sufficient to distinguish its mark from Plaintiff's in a meaningful way. Nor does the addition of the sailboat overcome the high degree of similarity. Defendant's sailboat and Plaintiff's wave are both nautical symbols, which could be confused, especially since neither is featured so prominently in the marks as to qualify as a major distinguishing characteristic. Therefore, when looking at the marks together for their total effect, the predominant image of Defendant's mark is the words "the Breakers" in upper and lower case letters. Plaintiff's mark is dominated by the all capital block letters image of the words "THE BREAKERS." Defendant's mere use of lower case letters in its main image, a qualifying phrase beneath it, and a small sailboat on the side can not overcome the overall similarity between the two marks.

The designs in this case are analogous to those in *Safeway Stores, Inc. v. Safeway Discount Drugs,* 675 F.2d 1160, 1165 (11th Cir.1982). In that case the court found that the dominant theme of the plaintiff's mark consisted of the store name, "Safeway," spelled out in large, block capital letters, (just like Plaintiff's in this case). Furthermore, the court found that the Defendant Safeway's use of an "S" shaped logo (analogous to the wave in the instant case) and

additional words on the letterhead were not sufficient to overcome the conclusion that the main theme of the defendant Safeway's mark was the name "Safeway" in block capitals. *Id.*

The defendant Discount Drugs' use of the same word, "Safeway," in capital block letters, was strikingly similar to the plaintiff's, and was not saved by the use of the additional words "Discount Drugs" in smaller type below. *Id.* at 1166.

In the instant case, although Defendant has substituted lower case letters for Plaintiff's use of all capitals, the overall impression is still one of similarity, which the addition of the words in much smaller type—"of fort lauderdale"—do not remedy.

### (3) SIMILARITY OF SERVICES

The third factor examines the similarity between the services offered by Plaintiff and Defendant. Plaintiff is a luxury resort hotel which offers vacation accommodations, as well as a variety of spa services, room service, golf, tennis, beaches, restaurants and banquet halls. Defendant holds itself out as a luxury hotel. Although the Breakers of Fort Lauderdale does not provide golf or tennis, it does provide vacation accommodations, jacuzzi, sauna, health and beauty center, restaurants, room service, concierge service, banquet hall, and access to the beach. The only difference between the services offered is in the degree of luxury. The fact that Defendant offers suite-style rooms which include kitchens, charges less, or provides average meeting rooms rather than lavish banquet halls does not render dissimilar the basic service offered: temporary housing for vacation purposes.

Furthermore, there was conflicting evidence as to whether Defendant also offers a time-share program in addition to regular hotel rooms. One witness testified that the time-share operation "ceased in 1983," while another testified that "The Breakers of Fort Lauderdale is [currently] a time-share type situation." Even assuming Defendant still offers this service to prior time-share buyers, that would not be sufficient to distinguish its basic service from Plaintiff's. Temporary stay programs are simply a pre-paid vacation. It is the same as renting a hotel room except that the guest knows in advance not only the precise dates of the vacation, but also the number of the room in which he will be staying. The "owner" of the time-share does not acquire a fee simple interest but rather a right to use the property at a specified time. The other evidence indicates clearly Defendant offers hotel—type services.

Defendant can not, on the one hand, hold itself out as a "luxury" hotel and then, on the other, be heard to argue that its services are nothing like Plaintiff's, which both parties agree is a luxury hotel. If it wishes to be considered a luxury hotel, then it must be willing to be considered in the same category. To say that Defendant's services are not, at core, similar to Plaintiff's simply because Plaintiff's hotel is unique, is at best a *non sequitur*.

### (4) IDENTITY OF CONSUMERS

As a practical matter Plaintiff and Defendant appeal to different types of consumers. However, consumers must know where they are going, both as to the destination city and the specific property, before they can distinguish between them. Foreign and out-of-state consumers may not be able to distinguish between Palm Beach and Fort Lauderdale which are sometimes grouped together with Miami as "South Florida," and occasionally as "The Gold Coast." As Ms. Wilson explained, Fort Lauderdale tends to draw more young people while Palm Beach attracts a more reserved, wealthier crowd. Presumably a professional travel agent would guide the consumer to the appropriate hotel and city. However, persons making their own arrangements must know the difference between the cities and hotels in order to arrive at the appropriate place for their taste. Ideally, if all patrons are properly informed, there would be no overlap of consumers. However, as it now stands, some consumers intending to stay with Plaintiff have ended up at Defendant's hotel, while others have sought to stay at Plaintiff's hotel for Defendant's rates.

## (5) IDENTITY OF ADVERTISING MEDIA

Plaintiff has a multi-million dollar advertising budget to promote the hotel both nationally and internationally. Plaintiff also has professional in-house sales directors and a marketing division. Plaintiff advertises locally mainly to attract summer business.

By contrast, Defendant advertises locally to promote special events or packages; it does not directly advertise nationally and internationally. However, by using direct mail targeted to tour operators, who contract with customers from various locations, Defendant injects itself into the national and international market.

## (6) DEFENDANT'S INTENT

The Breakers has been using its name since 1903 and has been world famous for many years. Defendant admitted it knew of Plaintiff's existence and reputation, and therefore must have known of the name "The Breakers" in 1984 when it changed its name to The Breakers of Fort Lauderdale. Although Defendant took no steps affirmatively to disassociate itself from Plaintiff, there was also no evidence that Defendant acted intentionally to deceive the public. Although Defendant did not encourage confusion, neither did Defendant attempt to avoid it.[10] Defendant's property is not on the beach, but rather a block inland. However, Defendant is located on Breakers Avenue, which mitigates against finding any intentional bad faith by Defendant. On the other hand, both Defendant's failure to feature the "of fort lauderdale" part of its name prominently and to disclaim any affiliation with The Breakers indicates acquiescence to accept any benefits which may have been derived from sharing a name with such a prominent competitor.

## (7) ACTUAL CONFUSION BETWEEN THE TWO MARKS

■ While actual confusion need not be proved, it is the best evidence of likelihood of confusion. *Amstar Corp.*, 615 F.2d at 263. In this case, the incidents of confusion, taken together, point overwhelmingly to a likelihood of continued confusion. The incidents described are not isolated, unrelated events. Rather, they represent an ongoing pattern which has occurred in the past and is likely to continue.

■ Upon thorough examination of the facts in the case, the court concludes that Defendant is using in commerce a "colorable imitation" of Plaintiff's mark which has, and is likely to continue to cause confusion in violation of Lanham Act, Section 32. Furthermore, the use of such a mark has caused, and continues to cause a likelihood of consumer confusion such that a consumer is likely to believe that Defendant's services are being sold with Plaintiff's consent or that Defendant is affiliated with Plaintiff, which is also in violation of Lanham Act, Section 43. Finally, the Court finds no merit in Defendant's proposed defenses. Therefore, Plaintiff is entitled to judgment and injunctive relief on these claims.

## COMMON LAW TRADEMARK INFRINGEMENT

Plaintiff's third count in the amended complaint alleges infringement of common law trademark rights. The elements required to prevail on this claim are the same as those required to prevail under Section 43(a) of the Lanham Act, or for a claim of common law unfair competition. *American United Life Ins.*, 731 F.Supp. at 486. Based on the foregoing analysis, it is clear Plaintiff has met its burden with regard to this claim as well.

## COMMON LAW UNFAIR COMPETITION

■ Count IV of the amended complaint states a claim for common law unfair competition based on infringement of a trade name or service mark. The elements of this claim are (1) that plaintiff is the prior user of the trade name or service mark, (2) that the trade name or service mark is arbitrary or suggestive, (3) that the defendant is using a confusingly similar trade name or service mark to identify similar services in competi-

10. Recently, Plaintiff has filed a motion seeking emergency relief alleging Defendant's continuing activities in which it blatantly represents to the public that it is affiliated with Plaintiff.

tion with the plaintiff's in the same trade area in which plaintiff has already established its trade name or service mark, and (4) that as a result of defendant's action, or threatened action, consumer confusion as to source or sponsorship is likely. *American United Life Ins.*, 731 F.Supp. at 486. For the reasons set forth in the findings above, Plaintiff has satisfied these elements and is entitled to injunctive relief on this claim as well.

Just as The Breakers has achieved a certain uniqueness as a luxury hotel with its name suggestive of its location, so have the Plaza in New York City, with a small plaza between its entrance and the intersection of Central Park South and Fifth Avenue, and the Fairmont in San Francisco atop its hill. To be sure, neither name is as distinctive a mark, legally speaking, as the Plaza's competitor, the Waldorf–Astoria, or the Fairmont's neighbor, the Mark Hopkins. But no one can deny the uniqueness, and strength, of the service marks of all three hotels.

**DONE AND ORDERED.**