THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
28 February 2007
AD

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Chicago Bears Football Club, Inc. and
NFL Properties LLC
v.
12TH Man/Tennessee LLC

_____

Opposition No. 91150925
to application Serial No. 78023394

_____

Jessica A. Rose of Quinn Emanuel Urquhart Oliver & Hedges
LLP for the Chicago Bears Football Club, Inc. and NFL
Properties LLC.

James H. Harris III of Harris, Martin, Jones, Shrum,
Bradford & Wommack, P.A. for 12TH Man/Tennessee LLC.

_____

Before Rogers, Drost and Kuhlke, Administrative Trademark
Judges.

Opinion by Drost, Administrative Trademark Judge:

On August 29, 2000, applicant filed an intent-to-use

application (No. 78023394) to register the mark 12TH BEAR,

in typed or standard character form, on the Principal

Register for the following goods:

Jewelry in Class 14

Bumper stickers in Class 16

Insulated beverage containers in Class 21

Towels in Class 24

Clothing for informal wear, namely pants, jackets, shirts, t-shirts, sweatshirts, shorts, etc.[1] in Class 25

Ornamental novelty buttons in Class 26.

On February 6, 2002, the Chicago Bears Football Club, Inc. and NFL Properties LLC (opposers) filed a notice of opposition to the registration of applicant's 12TH BEAR mark.

Opposers allege that applicant's mark is similar to numerous marks owned by opposers and that there is a likelihood of confusion of consumers under Section 2(d) of the Trademark Act. 15 U.S.C. § 1052(d). Opposers have submitted status and title copies of the following registrations:

> I. No. 952,441
> Mark: BEARS (typed)
> For: Entertainment services in the nature of football exhibitions some of which are rendered through the media of radio and television broadcasts in Class 41
> Issued: January 30, 1973
> Status: Second renewal

> II. No. 960,131
> Mark: CHICAGO BEARS (typed)
> For: Entertainment services in the nature of football exhibitions, some of which are rendered through the media of radio and television broadcasts in Class 41
> Disclaimer: Chicago
> Issued: May 29, 1973
> Status: Second renewal

> III. No. 1,803,222
> Mark: CHICAGO BEARS (typed)

---

[1] The identification of goods in Class 25 ends with the indefinite term "etc."

For:
     Trading cards, posters, magazines, postcards, calendars, wrapping paper, paper gift boxes, paper stickers, paper napkins, paper towels, books, posterbooks, notepads, paper plates, paper cups, paper hats and greeting cards in Class 16
     Men's, women's and children's clothing and footwear; namely, coaches caps, wool hats, painters caps, baseball caps, visors, headbands, ear muffs, knit face masks, belts, wristbands, T-shirts, tank tops, pajamas, golf shirts, sweaters, sweatshirts, jackets, neckties, braces, bibs, jerseys, night shirts, coats, robes, raincoats, parkas, ponchos, sneakers, gloves, scarves, snow suits, mittens, aprons, down jackets, leather jackets, shorts, sweatpants, jeans, pants, knickers, socks, underwear, bathing suits and leg warmers in Class 25.
2(f):  Chicago
Issued:  November 9, 1993
Status:  Renewed

Opposers allege that the "BEARS marks are famous to the public because of the widespread use of said marks, the great popularity of NFL football and the Bears Club, and the extensive media coverage of the NFL, and, in particular, the Bears Club." Notice of Opposition at 3. Furthermore, opposers allege that the "widespread use by the Bears Club, the NFL, and authorized licensees of the BEARS Marks when referring to the Chicago Bears football franchise has contributed to the strong public association of the BEARS Marks with the Chicago Bears, and such use inures exclusively to the benefit of Opposers." Id. Opposers maintain that applicant's goods are "a type consistent with the ancillary goods licensed by professional sports teams." Notice of Opposition at 4.

3

In addition, opposers also argue that registration to applicant should be refused because applicant's mark falsely suggests a connection between applicant and opposers under Section 2(a) of the Trademark Act. 15 U.S.C. § 1052(a). Finally, opposers allege that applicant's mark, when used, "will dilute the distinctive and famous quality of the BEARS marks." Notice of Opposition at 6.[2]

Applicant denied the salient allegations of opposers' notice of opposition.[3]

### The Record

The record consists of the pleadings; the file of the involved application; the testimonial deposition of Jeffrey Ringelstein, applicant's principal, with exhibits; the stipulated testimonial affidavit of David M. Proper, opposers' Counsel of Legal and Business Affairs, with exhibits; the testimonial deposition, with exhibits, of

---

[2] NFL Properties LLC is also opposing the registration of a second application of applicant for the mark 12TH RAVEN (Serial No. 78026554). Opposition No. 91157082. The other opposer in that case is the Baltimore Ravens Limited Partnership. Because the opposers are not the same, the marks are different, and the facts are not the same, we have chosen to issue separate decisions in these cases.

[3] Opposers also allege that applicant has applied to register other marks that are associated with NFL teams such as 12TH RAM, 12TH TEXAN, 12TH COWBOY, 12TH BILL, 12TH JAGUAR, 12TH BRONCO, 12TH BUCCANEER, 12TH STEELER, 12TH 49ER, 12TH CHIEF, 12TH DOLPHIN, 12TH EAGLE, 12TH PACKER, 12TH REDSKIN, 12TH VIKING and 12TH SEAHAWK. Notice of Opposition at 5-6. Except for the 12TH RAVEN mark (Opposition No. 91157082), the other marks are either no longer active or suspended awaiting the outcome of the 12TH BEAR and 12TH RAVEN oppositions. Applicant admits to filing "for the registration of other marks in order to specify the concept of the fan as the 12TH player." Answer at 2.

David M. Proper; the testimonial deposition, with exhibits, of Peter Quaglierini, opposers' manager for trading cards and memorabilia; the deposition of David Proper by written questions, with exhibits; and applicant's list of federal applications and registrations.

### Preliminary Matters

We begin by noting that the Chicago Bears registrations discussed earlier are owned by the Chicago Bears Football Club, Inc. NFL Properties LLC (NFLP) "is the licensing agent of the NFL and its Member Clubs and has three primary functions: (1) to license the trademarks of the NFL and its Member Clubs ("NFL Trademarks") to third parties for commercial use; (2) to protect the NFL Trademarks from infringement; and (3) to promote the interests of the NFL and its Member Clubs by engaging in approved publishing, promotional and marketing activities." Proper Affidavit at 3. "The NFL and the Chicago Bears have exclusively licensed all of their respective trademarks to NFLP for use by NFLP pursuant to these directives." Id.

Because of opposers' proof of ownership or licensed use of the registered marks for BEARS and CHICAGO BEARS, we find that opposers each have established their standing to oppose. See Chemical New York Corp. v. Conmar Form Systems, Inc., 1 USPQ2d 1139, 1142 (TTAB 1986) ("It is obvious that opposer Chemical New York, as owner of the 'PRONTO' marks

and registrations, and opposer Chemical Bank, as licensee and user of the marks, have such a 'real interest' in this proceeding").  See also William & Scott Co. v. Earl's Restaurants Ltd., 30 USPQ2d 1870, 1873 n.2 (TTAB 1994).

In addition, opposers have submitted evidence that they have used the BEARS marks on various items including those that are similar or identical to items for which applicant seeks registration.  These items include:

    Beach towels, Proper Ex. 20, p. 11
    Pennants, Proper Ex. 20, p. 7
    Bath towels, Proper Ex. 21, p. 12
    Ladies' scarves, Proper Ex. 21, p. 5
    Auto and bike tags, Proper Ex. 21, p. 9
    Slumber bags, Proper Ex. 22, p. 15
    Mugs, Proper Ex. 22, p. 16
    Watches, Proper Ex. 22, p. 18
    Back packs, Proper Ex. 23, p. 11
    Director's chairs, Proper Ex. 23, p. 15
    Photo frames, Proper Ex. 23, p. 16
    Gift wrapping, Proper Ex. 23, p. 17

This evidence supports the testimony of opposers' witness, David Proper, who testified (Affidavit at 5, ¶¶ 16 and 17) that:

    NFLP has issued licenses to dozens of companies for use
    of the NFL Trademarks, including specifically the Bears
    Club Marks.  These licenses encompass a wide variety of
    merchandise, including apparel items such as shirts, T-
    shirts, sweatshirts, pants, shorts, jackets and other
    apparel; novelty items, such as bumper stickers and
    ornamental novelty buttons; home products, such as
    towels and insulated beverage containers; gift items,
    such as jewelry and pins; sporting goods, toys and
    games, and many other items.  NFLP licenses the Bears
    Club Marks in connection with all of the above
    officially licensed NFL products.

    Other examples of representative NFL products licensed
    by NFLP and bearing the Bears Club Marks include

apparel items such as bibs, children's clothing, jerseys, outerwear and head wear; and such hard-line products as stationery and supplies, calendars, posters, trading cards, mugs, glasses, tailgating paraphernalia, party goods and wrapping paper, magazines, decals, note pads, greeting cards, and sports balls.

These uses occurred prior to applicant's filing date (See Proper affidavit Exhibits 19 (1971 NFL merchandise catalog), 20 (1973 NFL merchandise catalog), 21 (1979 NFL merchandise catalog) 22 (1987 NFL merchandise catalog), and 23 (1994 NFL merchandise catalog)).

Applicant has not used its mark, 12TH BEAR. See Ringelstein dep. at 34 ("Q. Have you used the 12TH Bear designation on any product? A. No, sir – no, ma'am. Excuse me. Not on any product"). As a result, applicant must rely on its application's filing date (August 29, 2000) as its constructive use date. Zirco Corp. v. American Telephone and Telegraph Co., 21 USPQ2d 1542, 1544 (TTAB 1991) ("[T]here can be no doubt but that the right to rely upon the constructive use date comes into existence with the filing of the intent-to-use application and that an intent-to-use applicant can rely upon this date in an opposition brought by a third party asserting common law rights"). See also Intersat Corp. v. International Telecommunications Satellite Organization, 226 USPQ 154, 156 n. 5 (TTAB 1985) ("The earliest date of first use upon which Intelsat can

rely in the absence of testimony or evidence is the filing date of its application").

Thus, opposers have also established priority as to their common law use of the BEARS and CHICAGO BEARS marks on goods that are either identical (towels) or closely related to applicant's goods (mugs, auto and bike tags, pennants, watches, and similar items). Also, priority is not an issue here in view of the Chicago Bears Football Club's ownership of registrations for the BEARS and CHICAGO BEARS marks for the goods and services in those registrations. See King Candy Co. v. Eunice King's Kitchen, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

## Likelihood of Confusion

In likelihood of confusion cases, we consider whether there is confusion by analyzing the facts as they relate to the thirteen factors set out in such cases as In re Majestic Distilling Co., 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003) and In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). Because the parties' goods, as will be discussed subsequently, are either in part identical, or otherwise closely related, the key issue in this case is whether applicant's mark is confusingly similar to opposers' BEARS and CHICAGO BEARS marks.

8

This "first DuPont factor requires examination of 'the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.'" Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting du Pont, 177 USPQ at 567). In this case, applicant's mark is 12TH BEAR while opposers' marks are BEARS and CHICAGO BEARS. The marks are similar to the extent that they both contain the word BEAR or BEARS. The term "Bears" is the only feature of one of opposers' marks and it is the dominant part of the CHICAGO BEARS mark, where Chicago identifies the location of the Bears Football Club. In applicant's mark, the term "Bear" dominates applicant's mark because the only other feature of the mark is the term 12TH. This numerical designation does not distinguish the marks inasmuch as it reinforces the connection with the Chicago Bears football team by specifically identifying a particular Bear, i.e., the twelfth Bear.[4] Therefore, the term "Bear" is the dominant feature of the marks. In re National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("[T]here is

---

[4] "Each football team has eleven players on the playing field at any one time." Proper affidavit at 14. Applicant admitted that its "12TH" marks utilize "the concept of the fan as the 12TH player in connection with the goods in order to specify and to involve the team sports fan who is … the twelfth on a football team." Answer at 2. Applicant further admitted that "12TH

9

nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties.  Indeed, this type of analysis appears to be unavoidable").

Furthermore, we cannot attribute much trademark significance to the difference in the plural and singular form of the word "Bear" in the marks.  Wilson v. Delauney, 245 F.2d 877, 114 USPQ 339, 341 (CCPA 1957) ("It is evident that there is no material difference, in a trademark sense, between the singular and plural forms of the word 'Zombie' and they will therefore be regarded here as the same mark"). To the extent that the singular/plural difference is noticed by consumers, it would not likely be significant because, as viewed in applicant's mark, the singular form of the word would merely be seen as identifying someone that is associated with the CHICAGO BEARS.  Moreover, applicant's mark would be suggestive of a group, as are opposers' marks, because implicit in the concept of a 12th Bear is that there are at least 11 others.  Therefore, the marks BEARS and 12TH BEAR have similar meanings and commercial impressions. Also, the addition of the term 12TH does not result in the marks having significantly different appearances or pronunciation inasmuch as these marks are dominated by the

---

designated a football fan that's universally known."  Ringelstein

term "Bear" and the term 12TH reinforces the "Bear" feature of the marks.  The similarities between 12TH BEAR and BEARS in sound, appearance, meaning, and commercial impressions outweigh their differences.

We also find that the marks 12TH BEAR and CHICAGO BEARS are similar.  Again, the term "Bear(s)" dominates both marks.  The geographically descriptive term "Chicago" is not as significant as the term "Bears," and therefore does not distinguish the marks.  Chicago identifies the primary location where the BEARS football team provides its services.  See In re Chatam International Incorporated, 380 F.3d 1340, 71 USPQ2d 1944, 1946 (Fed. Cir. 2004) ("GOLD, in the context of tequila, describes either a characteristic of the good – its color – or a quality of the good commensurate with great value or merit … In sum, the Board had good reason to discount ALE, JOSE, and GOLD as significant differences between the marks").  They are similar in sound, appearance, meaning, and commercial impression.  National Football League Properties, Inc. v. New Jersey Giants, Inc., 637 F. Supp. 507, 229 USPQ 785, 791 n.1 (D.N.J. 1986)("Defendant's mark 'New Jersey GIANTS' is similar to the Giants' registered marks 'New York Giants' and 'Giants' and the dominant element of the mark – 'Giants' – is identical, rendering those marks particularly confusing").

---

dep. at 36.

See also Indianapolis Colts Inc. v. Metropolitan Baltimore Football Club Limited Partnership, 34 F.3d 410, 31 USPQ2d 1811, 1817 (7th Cir. 1994) (parenthetical omitted):

> [W]e cannot say that the district judge committed a clear error in crediting the major findings of the Jacoby study and inferring from it and the other evidence in the record that the defendants' use of the name "Baltimore CFL Colts" whether for the team or on merchandise was likely to confuse a substantial number of consumers [with the INDIANAPOLIS COLTS]. This means … that the judge's finding concerning likelihood of confusion required that the injunction issue.

While we have taken into consideration the difference between 12TH and CHICAGO, this difference does not result in the marks not being similar. Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 223 USPQ 1281, 1283 (Fed. Cir. 1984) ("It is the similarity of commercial impression between SPICE VALLEY and SPICE ISLANDS that weighs heavily against the applicant"). We conclude that applicant's mark 12TH BEAR and opposers' marks BEARS and CHICAGO BEARS are similar.

Next, we must consider whether the goods and services of the parties are related. Here, the goods are in part identical because applicant seeks registration for pants, jackets, t-shirts, sweatshirts, and shorts and these goods are identical to items in the CHICAGO BEARS mark (No. 1,803,222). To the extent that the goods of the parties are identical, when "marks would appear on virtually identical goods or services, the degree of similarity necessary to

12

support a conclusion of likely confusion declines." <u>Century 21 Real Estate Corp. v. Century Life of America</u>, 970 F.2d 874, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992).

The vast majority of the involved goods are also closely related to opposers' goods. Applicant's goods are a variety of consumer items including jewelry, bumper stickers, insulated beverage containers, towels, pants, jackets, shirts, t-shirts, sweatshirts, shorts, and ornamental novelty buttons. Opposers' primary services are football exhibition services but their marks are also registered and/or used for a variety of items in Class 25 that are legally identical to applicant's goods, including jackets, T-shirts, golf shirts, sweatshirts, and shorts. Furthermore, opposers' witness, David Proper, testified (affidavit at 5) that opposers have "issued licenses to dozens of companies for use of the NFL Trademarks, including specifically the Bears Club Marks. These licenses encompass a wide variety of merchandise."

Opposers have also submitted catalogs of NFL products that demonstrate the scope of products that opposers license for use with their marks. For example, the 1973 catalog (Proper Ex. 20) includes items such as belts, rainwear, pennants, posters, linens, and towels. These items were available for all NFL teams. The index to this catalog also includes such NFL licensed products as booster buttons,

key chains, clocks, watches, jewelry, tankards, ceramic mugs, and tumblers. Applicant's jewelry, bumper stickers, insulated beverage containers, towels, clothing, and ornamental buttons are also related, if not identical, to opposers' goods (towels, clothing, watches, mugs, pennants, and paper goods).

When we are dealing with an opposition to register, as with other board proceedings, we must compare the goods as described in the application and the opposers' registrations to determine if there is a likelihood of confusion. Canadian Imperial Bank v. Wells Fargo Bank, 811 F.2d 1490, 1493, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987). As a result, we must assume that applicant's jewelry, bumper stickers, insulated beverage containers, towels, clothing items, and ornamental novelty buttons encompass all goods of that type. Octocom Systems, Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed"). See also Paula Payne Products v. Johnson Publishing Co., 473 F.2d 901, 177 USPQ

76, 77 (CCPA 1973) ("Trademark cases involving the issue of likelihood of confusion must be decided on the basis of the respective descriptions of goods"). Therefore, we conclude that applicant's and opposers' goods are in part identical, and otherwise related, and this factor also favors opposers.

Regarding the factors concerning potential purchasers and channels of trade, these factors also favor opposers. We have already determined that many of applicant's goods are identical to opposers' goods. Because some of the goods are identical, we must assume that the channels of trade and purchasers are the same. Genesco Inc. v. Martz, 66 USPQ2d 1260, 1268 (TTAB 2003) ("Given the in-part identical and in-part related nature of the parties' goods, and the lack of any restrictions in the identifications thereof as to trade channels and purchasers, these clothing items could be offered and sold to the same classes of purchasers through the same channels of trade"); In re Smith and Mehaffey, 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers").

Furthermore, applicant has made it clear that it intends to actually market its goods to purchasers who would be identical to opposers' fans and purchasers.

> Q. So apart from the 12TH portion of your designation, the second word bear, how did 12TH Bear, the word bear

15

> have an appeal to you, rather than – or have a marketing appeal to you, as opposed to a more specific name of a bear, 12TH Grizzly, 12TH Kodiak, 12TH Black Bear, 12TH Brown Bear?
>
> A. We realized there were a lot of Bears fans, as there are Dolphin fans.  Again, at any football level, whether it's peewee or whatever.  So we realized that.
>
> And, again, we're targeting fans.  We're not trying to – we're not pirates here.  We're not trying to traffic on Chicago Bears, their marks or their team.  We're not professing to be – anything to do with the professional team.  We're strictly looking at targeting fans, the fan base…  But again, we're targeting football fans, sports fans.

Ringelstein dep. at 37-38.  See also Ringelstein dep. at 7 ("The idea was… to be that company that would pervade this brand, 12TH designation, what have you, whether it be 12TH Bear, 12TH whatever high school, college, professional teams, to offer something to the fans to allow them to identify with a particular football team"); 10 ("And in this particular case, did you target fans of professional football?  A. Yes, sir."); and 16 ("Now, how is it you intend to use the 12TH Bear mark?  A. Well, market it as a brand for the fans of professional football, regardless of the team.  I'm sure the fans will identify with the particular team…").

Of course, opposers' "target consumers of the Chicago Bears and of goods and services bearing the Bears Club Marks are fans of Chicago Bears football and football fans in general."  Proper affidavit at 4.  In effect, the potential purchasers of applicant's and opposers' goods, in addition

16

to being legally identical, actually overlap to the extent that both applicant and opposers target fans of football as potential purchasers.

Opposers have identified their channels of trade as follows (Proper Affidavit at 5):

> NFL products are sold in a wide variety of retail trade locations, including, inter alia, department stores, discount stores, drug stores, fan shops, footwear specialty stores, grocery stores, and sporting goods stores. Specific examples of companies that distribute NFL products include, inter alia, K-Mart, Target, Wal-Mart, Sears, JC Penney, Dillard's, Foot Locker, Champs, Sports Authority, and Modell's Sporting Goods.

Opposers also sell these goods through "the Internet Web site of the official NFL online store." Proper affidavit at 13. Thus, not only must we assume, because the identifications in opposers' registrations and applicant's application contain no restrictions on channels of trade, that the parties' goods would be sold in the same channels of trade, but opposers' evidence of their broad channels of trade would likely encompass or overlap with applicant's channels of trade at the point that applicant actually sells its goods in commerce. In addition, the price of opposers' goods indicates that many of these items (such as posters, auto and bike tags, mugs, and T-shirts) would not involve careful or sophisticated purchasers. Proper affidavit at 5 (The price points for opposers' goods begin at just "a few dollars"). On the contrary, these items must be considered impulse purchases.

17

Fame, the fifth du Pont factor, is another factor that favors opposers.  Applicant admits that opposers' mark CHICAGO BEARS is famous:

> Q. Do you know whether the term Chicago Bears is a famous mark?
>
> A. Well, I would consider it famous.
>
> Q. What do you think it's famous for?
>
> A. Being a professional football team.

Ringelstein dep. at 25.  See also Ringelstein dep. at 23 (Applicant's principal admitted that he considers the Chicago Bears mark to "be a strong mark that identifies that team") and Applicant's Brief at 3 ("There are some things that are not at issue in this case.  No one denies that the Chicago Bears are a well known professional football team or that the Chicago Bears is a famous service mark for that team").

Opposers have also submitted evidence of the fame of the BEARS and CHICAGO BEARS marks.  With regard to the services, opposers began using the marks in association with football exhibition services in 1922 and the Bears Club won "NFL Championships eight times, including, most recently, Super Bowl XX in 1986."  Proper affidavit at 3.  As a result of a 1998 agreement with CBS, ABC, FOX and ESPN in 1998, "every Chicago Bears game is broadcast live by one of these NFL broadcast partners."  Proper affidavit at 7.  In the local Chicago broadcast market, the Chicago Bears have

18

enjoyed considerable success.  For example, in 1999, the television market share for Bears Club games "was 47, which means that 47% of all the households that were watching television at this time were watching the Bears Club game." Id. at 8.  Total attendance at the eight Bears Club home games in 2003 was 492,420.  Id.  Opposers' total annual sales from NFL merchandise is approximately $2-3 billion at retail and "the percentage of sales of NFL merchandise bearing the Bears Club Marks ranged from at least 1.69 percent to three percent during the time period from 1995 through 1999."  Id. at 6.  These figures indicate that sales of merchandise under the Bears Club marks were at least $30 million per year.  Opposers' witness testified that "millions of dollars have been spent cumulatively advertising and promoting the Bears Club and its marks, and millions of dollars worth of merchandise bearing the Bears Club Marks have been sold through NFLP's Licensees."  Id. at 7.

In addition, opposers also submitted several media surveys of articles that reference the Bears Club marks.

> On Opposers' behalf, a search was performed in the "News Sources, Combined" database of the LEXIS/NEXIS on-line research service for references to "BEARS w/2 football" for each five-year period within the twenty-five year time frame from January 1, 1976 to December 31, 2000.  These LEXIS/NEXIS searches disclosed 11,322 news articles that contained the search term during this twenty-five year time period.  A representative sample of 100 articles throughout the time frame was then obtained by arranging the articles chronologically

19

and selecting every 200th article for the time period of 1991 through 2000, every 125th article from the time period of 1986 through 1990; and every twelfth article from the time period of 1976 through 1985. Of this 100 article sample, 86 articles (or 86%) refer directly to the Chicago Bears.

Proper affidavit at 11.

A similarly constructed survey of articles for the search "Bears w/2 fan" produced the same result – 86% of the articles refer directly to the Chicago Bears. Proper affidavit at 11-12. Another survey of "Bears w/2 NFL" resulted in every article referring to the Chicago Bears. Proper affidavit at 12. In addition, the Chicago Bears website received 489,409 unique visitors between December 2002 and November 2003. Proper affidavit at 13.

Applicant maintains that "as an organization, the Chicago Bears are known to the public only as a football team; that is their fame and reputation. The sale of a sweatshirt or a pair of pants under the 12TH Bear label does not suggest a connection with a football team nor does it traffic upon the name 'Chicago Bears.' In fact, there is no connection between the two marks and their simple existence does not suggest any." Brief at 8.

We cannot agree with applicant's argument that opposers' BEARS marks have achieved fame only as a mark for the football team. It is certainly clear that opposers' Bears marks have achieved fame for football exhibition services, and applicant has admitted this fact. The Chicago

20

Bears football team games are broadcast on television and their games in the Chicago area have significant television ratings.  However, in addition to the fame of their marks for their football services, opposers have shown that opposers have a registration for the word CHICAGO BEARS for clothing and paper products.  Furthermore, they have also submitted evidence that they use the marks CHICAGO BEARS and BEARS alone for a variety of goods.  Opposers' witness, Mr. Proper, has indicated the NFL's "[t]otal annual sales revenue generated by NFL merchandise is approximately $2-$3 billion dollars at retail" (Proper affidavit at 6) and that sales of Bears Club merchandise generate millions of dollars in sales.  Opposers also spend millions of dollars "advertising and promoting the Bears Club and its marks." Proper affidavit at 7.  Therefore, because of the television exposure, advertising, and merchandise sales, we cannot agree with applicant that the fame of the Bears Club marks is limited to football exhibition services.

The evidence of record convinces us that the opposers' BEARS and CHICAGO BEARS marks have acquired significant fame and public recognition for the football exhibition services as well as for ancillary merchandise.  Under these circumstances, fame "of the prior mark, another du Pont factor, 'plays a dominant role in cases featuring a famous or strong mark.'"  Century 21 Real Estate Corp., 23 USPQ2d

at 1701, quoting, Kenner Parker Toys v. Rose Art Industries, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). "Famous marks thus enjoy a wide latitude of legal protection." Recot, Inc. v. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000) (FIDO LAY and FRITO-LAY confusingly similar even though the goods at issue were "natural agricultural products, namely, edible dog treats" and snack foods).

The Federal Circuit and its predecessor have held that "there is no excuse for even approaching the well-known trademark of a competitor and that all doubt as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous." Nina Ricci S.A.R.L. v. E.T.F. Enterprises Inc., 889 F.2d 1070, 12 USPQ2d 1901, 1904 (Fed. Cir. 1989), quoting, Planter's Nut & Chocolate Co. v. Crown Nut Co., Inc., 305 F.2d 916, 134 USPQ 504, 511 (CCPA 1962) (internal punctuation marks omitted). Therefore, inasmuch as opposers' marks have achieved significant recognition and renown, this factor weighs heavily in opposers' favor.

One of applicant's principal arguments relates to the sixth du Pont factor concerning the number and nature of similar marks in use on similar goods.

> [T]here were approximately 1827 third-party live "bear" trademarks listed in the Trademark Electronic Search System… Among these designations there are several that are just plain "bear." There is also a black

22

bear, a blue bear, a white bear, a big bear, a l'il bear, a polar bear, an ice bear, a sleepy bear, a jolly bear, and many others that embody the term "bear" preceded by a[n] adjective of one kind or the other. All of these "bear marks" enjoy registration and trademark protection.

Additionally, there are approximately twenty-three college football teams that call themselves "bears" … When asked about these football teams, Mr. Proper acknowledged that he was aware of twelve of them, and that he knew that three of them called themselves the Bears.

Brief at 4.

According to the exhibit (Proper dep., Ex 8), the following colleges are nicknamed the "Bears": Athens State University, Barclay College, Barnard College, Baylor University, Bridgewater State College, Brown University, Lenoir-Rhyne College, Livingstone College, Mercer University, New York Institute of Technology, Pikeville College, Shawnee State University, State University of New York-College of Potsdam, St. Joseph's College-Brooklyn Campus, Rocky Mountain College, Shaw University, Southwest Missouri State University, United States Coast Guard Academy, University of California-San Francisco, University of Central Arkansas, University of Northern Colorado, Ursinus College, and Washington University (St. Louis). Mr. Proper testified (dep. at 40) that "three of them are Bears… Baylor … The University of California. I don't think San Francisco is correct. I think it's the University of

California at Berkeley that's the Bears[5]… And Brown University."

Regarding the other uses of the term "Bears," we note that opposers' witness, Mr. Proper, was aware of the existence of only twelve of the listed colleges and, as noted above, he was aware of only three of these schools that used the name "Bears" in association with their college teams.

A. Okay.  I am familiar with – I am familiar with 12 of these colleges.

Q. Were you aware that they were all Bears?

A. I am still not aware that they are bears.  I am aware that three of them are Bears, yes.

Proper dep. at 39-40.

We have no evidence about the specific use of these marks by the various colleges or their teams nor of other third-party uses of the term "Bear(s)" on merchandise.[6]  While applicant

---

[5] Applicant subsequently refers to the team as "the California Golden Bears."  Brief at 17.

[6] While applicant has submitted a printout from the USPTO's database that shows that there are more than 1500 applications and registrations that contain the word "Bear," we give this evidence little weight.  In re Carolina Apparel, 48 USPQ2d 1542, 1542 n.2 (TTAB 1998) ("The Board does not take judicial notice of third-party registrations, and the mere listing of them is insufficient to make them of record").  Applicant's list is particularly unpersuasive inasmuch as there is no indication of the goods or services for which the marks are registered and there are numerous unregistered marks on the list.  We add that third-party registrations "may be used to demonstrate that a portion of a mark is suggestive or descriptive," but because the registrations are not of record, we cannot determine that BEARS has any particular significance for the services and goods at issue.  In re J.M. Originals Inc., 6 USPQ2d 1393, 1394 (TTAB 1987).  In any event, third-party registrations "cannot be used

24

has submitted copies of several websites that use the marks "Chicago Bears," these sites seem to be fan-type sites that discuss the performance of the Chicago Bears football team. It is not clear why these websites would support applicant's arguments that its mark for 12TH BEAR is not confusingly similar to opposers' BEARS and CHICAGO BEARS marks for the same or very similar goods. Applicant is not seeking registration of the mark for website-related services. Even if there were some relevance to these websites, we note that "it is entirely reasonable for the opposer to object to the use of certain marks in use on some goods which it believes would conflict with the use of its marks on its goods and services while not objecting to use of a similar mark on other goods which it does not believe would conflict with its own use."[7] McDonald's Corp. v. McKinley, 13 USPQ2d 1895, 1899-1900 (TTAB 1989).

---

to justify the registration of another confusingly similar mark." Id. See also AMF Inc. v. American Leisure Prods., Inc., 474 F.2d 1403, 177 USPQ 268, 269 (CCPA 1973) ("The existence of [third party] registrations is not evidence of what happens in the market place or that customers are familiar with them"); Dolfin Corporation v. Jem Sportswear, Inc., 218 USPQ 201, 207 (C.D. Cal. 1982) ("The mere citation of third party registrations, without proof of actual usage on related products do[es] not weaken the mark in issue"); Time Warner Entertainment Co. v. Jones, 65 USPQ2d 1650, 1659 n.20 (TTAB 2002) ("Third-party registrations are not evidence that the marks used therein are in use in commerce or that the public is familiar with them, for purposes of the sixth du Pont factor").

[7] We add that Mr. Proper testified that he was not aware of several of these sites.

Obviously, the word "Bear" is not a unique term in the United States and it is not surprising that the term has been associated with other sports teams. This, however, does not result in opposers' marks being entitled to only a limited scope of protection. The University of Georgia was able to enforce its trademark rights in its Bulldog mark despite the "fact that many other colleges, junior colleges, and high schools use an English bulldog as a symbol." University of Georgia Athletic Association v. Laite, 756 F.2d 1535, 225 USPQ 1122, 1129 (11th Cir. 1985). In that case, the schools the defendant referenced included: "twenty-six high schools, fourteen junior colleges, and sixteen colleges that use an English bulldog as a mascot. The list includes the Citadel, Drake University, Fresno State University, Mississippi State University, Louisiana Tech University, and Yale University." Id. at 1129 n.25. See also Dolfin, 218 USPQ at 207 (The fact that there "are others who have used DOLFIN trade names or marks in non-competing products or, even infringed plaintiff's rights does not weaken plaintiff's case").

Applicant also argues that its "intent is not to mislead the consumer as to the origin of the 12TH Bear product, but rather to offer an alternate means in which individuals may show allegiance to their sport team or teams. The 12TH Bear label will not seek an allegiance with

any specific team.  The 12TH Bear label seeks to open an avenue for a fan to demonstrate their allegiance to their team or teams."  Brief at 17.  Opposers argue that applicant "selected the designation '12th' or 'Twelfth,' with the singular, shortened version of the team names of twenty NFL Member Clubs, to refer to fans of each targeted NFL Member Club and to trade inappropriately on the goodwill of the selected Member Club, including the Bears."  Brief at 11.  While applicant may not have intended to mislead purchasers, it is not clear how the selection of numerous marks that are each based on the name of one of twenty NFL teams could have been done in good faith.  Furthermore, it is not clear how the fact that "it will not seek an allegiance with any specific team," will eliminate the likelihood of confusion.  However, we decline to find that the adoption was in bad faith, particularly in this case, where the adopted mark is not identical to opposers' marks and "Bears" is the name or nickname of some college football teams.  NASDAQ Stock Market Inc. v. Antartica S.r.l., 69 USPQ2d 1718, 1733 (TTAB 1998) ("On the other hand, merely because we decline to find that applicant adopted its mark [NASDAQ] in bad faith, it does not follow from this record that applicant has acted entirely in good faith.  While the factor does not weigh in the balance against applicant, it does not weigh in its favor either").

27

When we analyze the relevant factors regarding the likelihood of confusion, some, such as the lack of evidence of actual confusion, are not relevant because applicant has not used its mark on the goods in the application and therefore there has not been an opportunity for actual confusion to occur. Others clearly favor the opposers. The goods are identical or very closely related. Not only are the channels of trade for identical items legally identical but opposers actually market their goods in very broad channels of trade so that if applicant were to use its marks it would likely be in overlapping channels of trade. The evidence also makes it clear that opposers' merchandise is primarily marketed to fans of the Chicago Bears football team. Applicant also intends to market its goods to football fans, which would include specifically fans of the Chicago Bears football team. Again, the potential purchasers of both applicant's and opposers' goods would at least overlap.

The central dispute concerns whether the marks are similar. We have found that the marks 12TH BEAR and BEARS and CHICAGO BEARS are similar. Applicant argues that its mark "may be said to generate a 'calling to mind'" (brief at 6), which is not necessarily confusion. However, more than merely calling to mind, football fans that would encounter applicant's 12TH BEAR mark on the identified goods are

28

likely to assume that there is an association with opposers who own the marks BEARS and CHICAGO BEARS and use these marks on identical and very similar goods. Therefore, confusion is likely. See <u>DC Comics v. Pan American Grain Mfg. Co.</u>, 77 USPQ2d 1220, 1226 (TTAB 2005):

> Because opposer has used KRYPTONITE as a merchandising mark with respect to a variety of goods; because consumers recognize that, in the general marketing environment, merchandising marks are used to identify a variety of goods and services; and because opposer has used the term KRYPTONITE in connection with the promotion of certain food and beverage products, we find that… applicant's goods and opposer's goods are related. In short, based on the above, we find that consumers, seeing KRIPTONITA on prepared alcoholic fruit cocktails, are likely to believe that the mark has been licensed by opposer for such goods, and that the goods are therefore sponsored by opposer.

Finally, applicant also makes an argument (brief at 18) that appears to raise the issue of functionality of opposers' marks.

> At best, the 12TH Bear mark may be said to be purchased by the consumer in order to demonstrate an allegiance to the Chicago Bears… It was established that when goods with the school or team's insignia on them are being purchased, they are being purchased to demonstrate an individual's allegiance or identification with the group represented by the mark… What the consumer seeks when he purchases an emblem or an item that bears an emblem is the function of expression. He wants to communicate his allegiance and support of his team. He purchases a replica because that is the function of his expression. And because of the doctrine of functionality, the use of even exact replicas of a registered mark does not violate trademark law.

We have several problems with applicant's argument.

First, to the extent that applicant is arguing that

29

opposers' registered trademarks are functional, we note that it is improper to raise this defense without counterclaiming or petitioning to cancel the marks on this basis. Contour Chair-Lounge Co. v. The Englander Co., 324 F.2d 186, 139 USPQ 285, 287 (CCPA 1963) ("[T]his is an opposition only and in an opposition, this court has always held that the validity of the opposer's registrations are not open to [collateral] attack"); Cosmetically Yours, Inc. v. Clairol Inc., 424 F.2d 1385, 1387, 165 USPQ 515, 517 (CCPA 1970) ("As long as the registration relied upon … remains uncanceled, it is treated as valid and entitled to the statutory presumptions"). In this case, opposers own or are licensed to use the registered marks CHICAGO BEARS and BEARS.

Second, this case is not similar to International Order of Job's Daughters on which applicant relies. In that case:

> The TTAB gave preclusive effect to the Ninth Circuit's determination that the Job's Daughters name and emblem were merely "functional aesthetic components of the product, not trademarks," primarily as a result of the widespread merchandising of Job's Daughters jewelry by many American retail jewelers (including Lindeburg) who are independent of Job's Daughters.

International Order of Job's Daughters v. Lindeburg and Company, 727 F.2d 1087, 220 USPQ 1017, 1018-19 (Fed. Cir. 1984), discussing International Order of Job's Daughters v. Lindeburg and Company, 633 F.2d 912, 208 USPQ 718 (9th Cir. 1980), cert. denied, 452 U.S. 941 (1981). Here, applicant

30

has not shown that there has been widespread merchandising of the BEARS club marks by independent entities.

Also, we reject applicant's argument because it apparently would allow others to register marks that are similar to registered marks in order to show support or hostility to a sports team. American case law simply does not recognize such a right.

> In light of the above, and assuming for the sake of argument that aesthetic functionality is a valid basis for opposing registration, we concur with applicant that the marks at issue are not aesthetically functional as used in connection with clothing. While, especially in the case of apparel imprinted with designs featuring "Bucky Badger," it is undisputed that many purchasers buy such garments because they find "Bucky" to be "cute" or otherwise appealing and do not care about the particular quality of the goods or whether the University sponsors or endorses them, these facts are legally immaterial. That is to say, the fact that consumers buy a T-shirt, sweatshirt or other garment because they like and want the particular "Bucky Badger," "Bucky on W" or "WISCONSIN BADGERS" design imprinted thereon does not render such designs aesthetically functional. Taken to its logical conclusion, opposers' argument would eliminate trademark protection and registrability for any popular and commercially successful design which is imprinted on clothing, irrespective of whether the design additionally is source-indicative to at least some consumers.

University Book Store v. University of Wisconsin Board of Regents, 33 USPQ2d 1385, 1406 (TTAB 1994)(footnote omitted).

For example, despite the finding of the abandonment of the Baltimore Colts mark and the resulting anger of local fans when the team moved to Indianapolis, another team was not permitted to use the mark BALTIMORE CFL COLTS. See,

31

e.g., <u>Indianapolis Colts</u>, 31 USPQ2d at 1814 ("The Colts' abandonment of a mark confusingly similar to their new mark neither broke the continuity of the team in its different locations -- it was the same team, merely having a different home base and therefore a different geographical component in its name -- nor entitled a third party to pick it up and use it to confuse Colts fans").

The mere fact that a trademark owner's mark is associated with a movie, television show, university, or sports team does not mean that it is functional and available for others to use to promote their goods when the trademark owner is actively licensing the mark for related items.  See <u>In re Paramount Pictures Corporation</u>, 217 USPQ 292, 293 (TTAB 1983) ("In the case before us, we have a mark well known as the name of a television show and a movie.  In view of applicant's registration of 'STAR TREK' for a number of other goods, it is clear that it performs a trademark function and is recognizable as such to the extent that the public would associate articles on which it appears as having a common origin").[8]

---

[8] We add that the case of <u>American Footwear Corp. v. General Footwear Co.</u>, 609 F.2d 655, 204 USPQ 609, 616 (2d Cir. 1979), is distinguishable because the "trademarks registered to Universal [relating to the *Six Million Dollar Man* and *The Bionic Woman* television shows] were in the areas of T.V. entertainment and toys.  This market area bears little if any relationship to footwear, and diminishes the strength of Universal's contention that it had established a right to the term 'bionic' as a fanciful mark in the field of footwear."  In the present case, opposers have shown that the goods of the parties are not only

We cannot conclude that applicant has any right to register its mark simply because it attempts to market its goods to a fan who wants "to communicate his allegiance and support of his team."  The trademark owner has a right to market its promotional items to those fans and to prevent others from marketing promotional items to the same fans by using a confusingly similar mark.

We conclude that applicant's mark, 12TH BEAR, if it were used on the identified goods, is likely to cause confusion in view of opposers' marks for BEARS and CHICAGO BEARS.[9]

Decision:  The opposition is sustained and registration to applicant of its mark is refused.

---

related, but in some cases, identical, and that opposers have priority of use for these items, unlike the party in American Footwear.  Id.
[9] In view of our disposition of the case on the likelihood of confusion ground, we do not reach the falsely suggesting a connection and dilution claims.